COMMONWEALTH *vs.* ROBERT S. LEZYNSKI.

Essex. April 1, 2013. - August 2, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Controlled Substances. Constitutional Law,* Confrontation of witnesses, Blood test, Harmless error. *Practice, Criminal,* Confrontation of witnesses, Harmless error, Failure to object. *Evidence,* Blood sample, Intoxication. *Witness,* Expert. *Intoxication.*

At the trial of indictments charging manslaughter and possession with intent to distribute a class B controlled substance (fentanyl), the admission of the results of laboratory testing and toxicological analysis of the decedent's blood through the testimony, on direct examination, of an expert witness who had not conducted any of the testing, in violation of the defendant's confrontation right under the Sixth Amendment to the United States Constitution, was harmless beyond a reasonable doubt, where, given the jury's acquittal of the defendant on the manslaughter charge, the cause of death had little bearing on the elements required to prove the possession with intent charge; and where the independent evidence that the defendant had possessed fentanyl with the intent to distribute it was overwhelming. [116-119]

INDICTMENT found and returned in the Superior Court Department on June 30, 2006.

The case was tried before *Richard E. Welch, III,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas C. Foley* for the defendant.

*David F. O'Sullivan,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. The defendant, Robert S. Lezynski, was tried before a jury in the Superior Court on indictments charging him with manslaughter and possession with intent to distribute a class B controlled substance (fentanyl)[1] in connection with the death of Richard Beaulier; the jury found the defendant guilty

---

[1]Fentanyl is a prescription drug that depresses the central nervous system and is used to treat moderate to severe pain. Fentanyl can be administered externally in the form of a transdermal patch; the patch consists of a gel-like substance

only of the drug charge. At trial, evidence concerning the results of laboratory testing and toxicological analysis of Beaulier's blood, showing the presence of a high level of fentanyl, was admitted during the direct examination of a toxicologist testifying as an expert witness for the Commonwealth, although the witness himself had not conducted any of the testing. The defendant appealed his conviction to the Appeals Court. In a decision pursuant to its rule 1:28, that court reasoned that the admission of the quantitative results of toxicology testing conducted by a nontestifying analyst constituted constitutional error that should be analyzed to determine whether it was harmless beyond a reasonable doubt, despite the defendant's failure to preserve the issue at trial. *Commonwealth* v. *Lezynski*, 81 Mass. App. Ct. 1112 (2012). Concluding that the error was indeed harmless, the Appeals Court affirmed the defendant's conviction. We granted the defendant's application for further appellate review. We affirm the conviction, but our analysis of the toxicology evidence differs from that of the Appeals Court.

*Background.* The jury could have found as follows from the evidence presented at trial. In December, 2004, the defendant was employed as a truck driver for Hiltz Waste Disposal (Hiltz), a company located in Gloucester that performed waste disposal and recycling services. Beaulier also was employed by Hiltz as both a truck driver and a "lumper," a laborer responsible for picking up curbside waste and recycling and loading it onto the truck.

On December 17, 2004, the defendant and Beaulier, along with other employees, attended the Hiltz annual Christmas party held at the company's maintenance facility. The party began sometime after 5 P.M. About a week before the party, the defendant reported to his coworker Lee Hopkinson that he had discovered several "morphine patches"[2] in a dumpster along his route and offered to sell one of these to Hopkinson. On the day of the party, the defendant offered to sell or give what he called "fentanyl patches" to coworker Michael Gauthier, and at the party

within plastic packaging. Patches are not intended for oral ingestion. According to the testimony at trial, the ingestion of the gel contents of a fentanyl patch results in a euphoric "high" feeling.

[2]In his testimony Hopkinson described the patches as "morphine patches," not "fentanyl patches."

to coworkers Bart Groves and Brian Macdonald. Groves and Gauthier declined the offer, but the defendant gave Macdonald a patch. The defendant also offered to sell a fentanyl patch to Beaulier for fifty dollars, but eventually gave the patch to Beaulier after explaining that Beaulier could "just pay [the defendant] later." At some point during the party, Beaulier tore open the plastic wrapping of the fentanyl package and ingested its contents.

By the party's end, Beaulier — who had smoked marijuana before the party and who also had been drinking beer both before and throughout the party — was extremely intoxicated. The defendant drove Beaulier and Beaulier's girl friend, Gina Genest, to Beaulier's home. When they arrived, Beaulier was lying in the back seat of the car, unresponsive and perceived by Genest to be "passed out." The defendant and Genest left him there and went into Beaulier's house for some time, where the defendant produced a fentanyl patch and asked Genest if she wanted to "do one." Genest returned to the car and, noting that Beaulier remained unresponsive in the back seat, telephoned 911 for emergency assistance. Beaulier was transported to the hospital and died shortly thereafter. The cause of death was acute fentanyl and alcohol intoxication.

At the defendant's trial, Dr. George Behonick, the director of forensic toxicology for the department of hospital laboratories at the University of Massachusetts Memorial Health Care System (UMass Memorial), appeared as an expert witness for the Commonwealth. In his direct examination, he testified that a "front line" analyst at the UMass Memorial laboratory performed an immunoassay analysis as well as a "whole blood comprehensive drug screen"; the drug screen had yielded a "match" for fentanyl; and the sample was then referred to National Medical Services (NMS) laboratory, a private laboratory in Pennsylvania, for quantitative analysis. Dr. Behonick further testified to the results of the toxicology report prepared by the Pennsylvania laboratory — 6.5 and 5 nanograms per milliliter of fentanyl and the metabolite norfentanyl respectively — and opined that these results were consistent with a "lethal" outcome. The defendant did not object to Dr. Behonick's recitation of the results of the laboratory analyses performed by the analysts at the UMass

Memorial and NMS laboratories. Nor did he object to the admission of the autopsy report, to which the toxicology report from UMass Memorial referencing these results was attached.

The jury found the defendant not guilty of manslaughter but guilty of the drug charge. The Appeals Court concluded that Dr. Behonick's verbatim reading of the toxicology report from the NMS laboratory into the record "was error akin to that identified in *Melendez-Diaz* v. *Massachusetts*," 557 U.S. 305 (2009) (*Melendez-Diaz*), and violated the defendant's right of confrontation under the Sixth Amendment to the United States Constitution. The Appeals Court concluded that, although the defendant did not object to the admission of the evidence at trial, where the defendant's trial took place after the decision of this court in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005) (*Verde*), but before the United States Supreme Court's decision in *Melendez-Diaz*, the correct standard of review was harmless beyond a reasonable doubt, and further that the Commonwealth met that standard. We granted the defendant's application for further appellate review limited to whether admission of the toxicology evidence, in the manner described above, required reversal.[3]

*Discussion.* We agree with the Appeals Court that the admission of Dr. Behonick's testimony on direct examination reciting the results of the toxicology analysis performed by the Pennsylvania laboratory as to the concentration of fentanyl in the tested sample of Beaulier's blood was error of constitutional dimension, a point on which the defendant and the Commonwealth also agree. See *Commonwealth* v. *Greineder*, 458 Mass. 207, 237 (2010), *S.C.*, 464 Mass. 580, 582-584 (2013) (deoxyribonucleic acid [DNA] testing results); *Commonwealth* v. *Durand*, 457 Mass. 574, 584-585 (2010), and cases cited (autopsy report).[4]

It does not necessarily follow, however, that even though this

---

[3]In his appeal to the Appeals Court, the defendant had included a challenge to the sufficiency of the indictment charging him with possession of a class B controlled substance with intent to distribute. The Appeals Court rejected that challenge, and we do not consider it in connection with our limited further appellate review.

[4]The Appeals Court concluded that Dr. George Behonick permissibly could recite in his direct testimony the results of the comprehensive drug screen performed in the laboratory that he supervised. That is incorrect, given that Dr. Behonick did not perform the drug screen. The fact that Dr. Behonick was, in his words, "responsible for the technical oversight of the laboratory,

case was tried after *Verde* and before *Melendez-Diaz*, it is necessary or appropriate to apply the harmless beyond a reasonable doubt standard of review in considering the effect of the error. At the time of the defendant's trial, a drug certificate — the focus of the *Melendez-Diaz* case — was deemed admissible by statute as prima facie evidence of the nature and quantity of the substance analyzed, see G. L. c. 111, § 13, and its admission by itself, without the benefit of testimony by the certifying chemist who performed the analysis, had been blessed by this court in *Verde, supra* at 282-284, as not violating a defendant's constitutional right of confrontation. Because this was the state of our law, we concluded that in a trial conducted after *Verde* but before *Melendez-Diaz*, any objection to the admission of a drug certificate as violative of the defendant's confrontation rights would have been futile, and therefore the error resulting from admission of a drug certificate should be reviewed under the harmless beyond a reasonable doubt standard despite the absence of an objection at trial. *Commonwealth* v. *Vasquez*, 456 Mass. 350, 356, 358-359 (2010).

The toxicology evidence at issue here is different. At the time of the defendant's trial, Massachusetts evidence law had long precluded an expert witness, on hearsay grounds, from testifying on direct examination to underlying test results or other facts on which his or her opinion was based unless the witness

---

which includes the quality control and appropriateness of procedures that are rendered in doing the testing," is not a substitute for having performed the testing himself. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 782-784 (2010), cert. denied, 131 S. Ct. 2441 (2011). Cf. *Bullcoming* v. *New Mexico*, 131 S. Ct. 2705, 2714-2715 (2011). We have no need to consider whether under the Supreme Court's five-to-four decision in *Williams* v. *Illinois*, 132 S. Ct. 2221 (2012), Dr. Behonick's recitation of the laboratory analyses might have satisfied the Sixth Amendment to the United States Constitution, because even if it may have, this component of his testimony was inadmissible under Massachusetts evidence law, as discussed in the text, *infra*. Dr. Behonick permissibly could (and did) testify on direct examination to an *opinion* formed by examining the results reported on the toxicology report, see *Commonwealth* v. *McGrail*, 80 Mass. App. Ct. 339, 343 (2011), namely, his opinion that the amount of fentanyl measured in Beaulier's blood was consistent with a lethal outcome. However, he could not read into evidence, as he did here, the factual data contained in the report. See *Commonwealth* v. *Greineder*, 464 Mass. 580, 584 (2013); *Commonwealth* v. *Barbosa, supra* at 783-784; *Commonwealth* v. *McGrail, supra* at 344-345. See generally *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986).

had performed those tests or unless the other facts, although hearsay, were independently admitted in evidence. See, e.g., *Commonwealth* v. *Nardi,* 452 Mass. 379, 391 & n.13, 392-393 (2008); *Commonwealth* v. *Markvart,* 437 Mass. 331, 338 (2002); *Commonwealth* v. *Jaime,* 433 Mass. 575, 577-578 (2001); *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 530-532 (1986). Compare Mass. G. Evid. § 703 (2013), with Fed. R. Evid. 703 (2012). Accordingly, the defendant here had readily available to him grounds on which to object to the now-challenged testimony given by Dr. Behonick concerning the results of toxicological analyses that he had not performed. In other words, an objection to the admission of this evidence by the defendant would not have been futile. Compare *Commonwealth* v. *Vasquez,* 456 Mass. at 358-359. In these circumstances, there is much force to the Commonwealth's argument that the defendant should not be relieved of the obligation to raise a timely objection at trial, and because he did not do so, the error at issue should be reviewed under the substantial risk of a miscarriage of justice standard. In the end, however, the issue concerning the correct standard of review to apply to the trial error makes no difference to the outcome here, because the standard of harmless beyond a reasonable doubt itself was met.

To prove the defendant guilty of unlawful possession of a class B substance (fentanyl) with intent to distribute, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) knowingly and intentionally (2) possessed a class B controlled substance (fentanyl), (3) with the specific intent to distribute it. *Commonwealth* v. *Acosta,* 81 Mass. App. Ct. 836, 839-840 (2012), citing *Commonwealth* v. *Gollman,* 436 Mass. 111, 116 (2002). Cf. *Commonwealth* v. *LaPerle,* 19 Mass. App. Ct. 424, 426-429 (1985). The results contained in the Pennsylvania laboratory's toxicology report were highly material to the manslaughter charge, because the presence of fentanyl in Beaulier's blood, and more particularly its relatively high concentration, bore directly on the cause of his death.[5] However, the cause of death had little bearing on the elements required to prove the possession with intent

---

[5]To a lesser extent, the same is true of Dr. Behonick's testimony indicating that the "whole blood" drug screen performed at the University of Massachusetts Memorial Health Care System laboratory had identified fentanyl in Beaulier's blood.

charge. The independent — that is, unrelated to the toxicological analyses — evidence at trial that the defendant knowingly possessed and intended to distribute fentanyl (in the form of fentanyl patches) to others on December 17, 2004, was overwhelming. Three witnesses (Groves, Gauthier, and Macdonald) testified independently that the defendant offered to sell or give a fentanyl patch to that witness at or before the December 17 Hiltz Christmas party; a fourth witness (Hopkinson) observed the defendant giving a fentanyl patch to Beaulier at the party; and a fifth (Genest) saw the defendant produce a fentanyl patch and cut it open with a pair of scissors in the kitchen of Beaulier's house immediately after the party.[6] As to the nature of fentanyl, the judge properly instructed the jury that fentanyl is a class B controlled substance as a matter of law, and neither party disputed this instruction or otherwise contested the identity of the substance in the transdermal patches as fentanyl.

When considered in light of all this evidence,[7] we think it is hardly conceivable that the jury were influenced by the erroneously admitted toxicology evidence in finding that the defendant had possessed fentanyl with intent to distribute it. In sum, this is a case where the independent evidence of the defendant's guilt is so powerful that we are satisfied the improperly admitted evidence would have had little or no effect on the fact finder, see *Commonwealth* v. *Vasquez*, 456 Mass. at 362, and therefore the error was harmless beyond a reasonable doubt.

*Judgment affirmed.*

⋅   ⋅

---

[6]Corroborating Genest's testimony, a State police trooper testified that the police seized a transdermal fentanyl patch wrapper and a pair of scissors from Beaulier's kitchen counter during their investigation.

[7]It is true — as the defendant's trial counsel argued in her closing statement — that the jury could disbelieve all the witnesses who testified to the defendant's offering fentanyl patches at the Christmas party, but the number of such witnesses and the consistent testimony they offered concerning the defendant's efforts to distribute the fentanyl patches make that possibility highly unlikely.