NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10834

COMMONWEALTH  vs.  AMARAL MONTROND.


Plymouth.     February 14, 2017. - May 17, 2017.

Present:  Gants, C.J., Lenk, Hines, Lowy, & Budd, JJ.


Homicide.  Constitutional Law, Assistance of counsel,
    Confrontation of witnesses.  Intoxication.  Evidence,
    Intoxication, Prior misconduct, Relevancy and materiality,
    Expert opinion.  Witness, Expert.  Practice, Criminal,
    Capital case, Assistance of counsel, Confrontation of
    witnesses.



    Indictments found and returned in the Superior Court
Department on November 16, 2007.

    The cases were tried before Paul E. Troy, J.; a motion for
a new trial, filed on July 12, 2012, and a motion for
postconviction discovery, filed on May 2, 2013, were considered
by him, and following remand by this court, the motion for a new
trial was heard by Thomas F. McGuire, Jr., J.


    Leslie W. O'Brien for the defendant.
    Laurie Yeshulas, Assistant District Attorney, for the
Commonwealth.

LENK, J.  The defendant appeals from his conviction of murder in the first degree[1] on a theory of deliberate premeditation in the shooting death of Carlita Chaney on August 16, 2007, and from the denial of his motion for a new trial. The defendant's consolidated appeal from his convictions and from the denial of his motion for a new trial first came before this court in November, 2014, when, following oral argument, we stayed the appeal and remanded the matter to the Superior Court to conduct an evidentiary hearing concerning the defendant's ineffective assistance of counsel claim and the location of certain telephone records.  After that hearing, the defendant renewed his motion for a new trial, which the judge denied.

On appeal, the defendant argues that his trial counsel was ineffective, and that his right of confrontation pursuant to the Sixth Amendment to the United States Constitution was violated by virtue of certain testimony from the Commonwealth's medical examiner.  He also contends that both motion judges erroneously denied his motion for a new trial.  Finally, the defendant asks that we exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt.  We conclude that there was no error requiring reversal, and discern no reason to exercise our

---

[1] The defendant also was convicted of unlawful possession of a firearm, unlawful possession of ammunition, and being an armed career criminal.

extraordinary power under G. L. c. 278, § 33E.  Accordingly, we affirm the convictions.

1.  Background.  a.  Facts.  Based on the evidence at trial, the jury could have found the following.  The defendant and the victim had been involved in a romantic relationship and had two children together.  They lived together in Brockton from 1997 until 2002, when they broke up.  The victim then moved to Ohio with the children and had a child with someone else.  In 2006, she and the three children moved to Spartanburg, South Carolina.  Although her romantic relationship with the defendant had ended, the victim would bring the children to Brockton for one month every summer, and would stay with the defendant and his family.[2]

In early October, 2006, the victim's younger sister, Kenyisha Chaney,[3] learned that the defendant was listed on the Internet Web site, MassMostWanted.  She told this to the victim, who was then living in South Carolina; at that time, the defendant was staying at the victim's house.  Shortly after Kenyisha informed her of the defendant's "wanted" status, the victim alerted the South Carolina police.  The defendant was

---

[2] The defendant lived with his parents and his brother at the parents' house in Brockton.

[3] Because Carlita Chaney and her sister, Kenyisha Chaney, share a last name, we refer to Kenyisha by her first name.

arrested at the victim's house and was returned to Massachusetts.  Subsequently, he was released on bail.[4]

In July, 2007, the victim returned to Brockton to stay with the defendant's family for one month.  Although the victim did not spend the entire month at the defendant's parents' house, she was staying there on the night of August 15, 2007.  That night, Kenyisha spoke with the victim by cellular telephone at approximately 11:30 P.M.  Kenyisha testified at trial that she heard the defendant in the background telling the victim to get off the telephone and that the victim told her that the defendant had an "attitude" toward her and had called her a "snitch."[5]

Around 1 A.M. on the morning of August 16, 2007, the defendant shot the victim in the head at close range as she reclined on the couch in the basement of the Montronds' home. According to the defendant's parents, who were awakened by the

---

[4] The defendant's sister, Patricia Montrond, testified at trial that the defendant spoke with her at some point shortly after his 2006 arrest, and said that he did not harbor any ill will toward the victim for turning him in, commenting that she "had her reasons."

[5] The content of this conversation was a contested issue at trial.  In her grand jury testimony, Kenyisha testified that the victim had told her over the telephone that the defendant had "called her a snitch."  In an interview with a police officer two years later, Kenyisha stated that she actually had heard the defendant in the background referring to the victim as "the snitch of the day."  Kenyisha was extensively cross-examined on this issue.

sound of the gunshot, they rushed downstairs and saw the defendant screaming and crying, "accident, accident." He appeared to be suicidal. Jose Montrond, the defendant's father, told Maria Montrond,[6] the defendant's mother, to retrieve the gun, which was on the floor, and put it upstairs. Maria picked up the gun and gave it to Jose, who put the gun in a plastic bag and placed it inside a kitchen cabinet. The Montronds testified that they did nothing further with the gun, which police found with the safety lock engaged. No one called 911.

Shortly thereafter, Patricia Montrond, the defendant's sister, received a frantic telephone call from their brother, Maradona Montrond, telling her that "something bad happened" and that she should come to the Montronds' house immediately. She arrived to find the defendant crying, pounding his head, and yelling that the shooting was an accident. She called 911 and told the dispatcher:

> "This is an emergency. My brother just told me he was playing with a gun. He thought the gun was on safety. He just killed his girl friend. He just killed his girl friend downstairs on the couch by mistake. A gun was -- he thought the gun was -- my brother thought the lock -- the gun was locked when he was playing with it. He killed his girl friend by mistake. My brother thought his gun was on lock, I guess. He was playing with it and pointing it at his girl friend. She's dead; she's dead on the couch."

---

[6] Because the defendant's parents, Jose and Maria Montrond, his brother, Maradona Montrond, and his sister, Patricia Montrond, share a last name, we refer the them by their first names.

Brockton police Officer Jason Ford was one of the first responders. When he entered the house, he saw the defendant wearing a "soiled" t-shirt and staring at the ground with red, glassy eyes; the defendant looked as if he had been crying. Ford retrieved the gun from the cabinet where the defendant's parents had placed it, noted that the safety lock was on, and put it in the trunk of his cruiser. The defendant was arrested and read the Miranda rights.

b. Trial and posttrial proceedings. At trial, the theory of the defense was that the shooting was accidental. In particular, trial counsel argued that the defendant thought that the safety lock was engaged when the firearm fired the fatal shot. The jury convicted the defendant of murder in the first degree and the firearms offenses.[7]

In July, 2012, the defendant filed a motion for a new trial on grounds of ineffective assistance of counsel and a violation of his right to confrontation under the Sixth Amendment. The defendant argued that his trial counsel had provided ineffective assistance by failing (1) to present evidence that the defendant was intoxicated at the time of the shooting;[8] (2) to object to

---

[7] The defendant was convicted of being an armed career criminal in a separate, jury-waived proceeding.

[8] In support of the assertion that he had been intoxicated, the defendant submitted his own affidavit and that of one of his friends, each stating that the defendant had been drinking

the admission of testimony regarding the defendant's name appearing on MassMostWanted; and (3) to seek to strike an answer by the Commonwealth's medical examiner that, in her opinion, the shooting was a homicide. The defendant's contention that he had been deprived of his right to confrontation was based on a statement by the medical examiner, who was permitted to testify, over trial counsel's objection, to the results of toxicology testing that she had not conducted.

The first motion judge, who was also the trial judge, denied the motion for a new trial without an evidentiary hearing. The judge rejected the ineffective assistance claim involving evidence of the defendant's intoxication for three reasons: first, he did not credit the affidavits submitted by the defendant; second, he concluded that Ford's testimony was not sufficient to establish "an inference that [the defendant] was so debilitated by alcohol that his ability to form the requisite criminal intent was impaired"; and third, he determined that the evidence of intoxication could have undermined the defense of accident. The judge denied the ineffective assistance of counsel claim arising from trial counsel's failure to object to references to the defendant's

_____

heavily on the evening of the shooting, as well as the grand jury testimony of Brockton police Officer Jason Ford. Ford testified before the grand jury but not at trial that when he first arrived at the Montronds' house, he noticed that the defendant "reeked of B.O., like sweat and B.O., and of alcohol."

name appearing on MassMostWanted both because the references were properly admissible to show the defendant's motive and because, even if they were admitted in error, there was no substantial likelihood of a miscarriage of justice.  With respect to the ineffective assistance of counsel claim concerning the medical examiner's opinion that the killing was a homicide, the judge determined that trial counsel had mitigated the impact of the testimony by following up on the examiner's answer and ultimately causing her to recant her opinion.

As to the medical examiner's testimony concerning the toxicology testing she had not performed, the judge concluded that there had been a violation of the defendant's rights under the confrontation clause, but that trial counsel had mitigated the erroneous admission of the medical examiner's testimony through an effective cross-examination and that the error did not contribute to the verdict.  The judge also denied the defendant's motion for expanded discovery, which would have required the Commonwealth to provide any telephone records in its possession that indicated calls from Kenyisha's telephone to the victim on the night of the shootings.[9]

---

[9] The defendant's appellate counsel stated in the motion that she had reviewed "the defendant's trial file and ha[d] been unable to locate the records."  She also noted in an affidavit attached to the motion that she had been unable to contact trial counsel, who had been suspended from the practice of law.

c. _First oral argument_. We initially heard oral argument in November of 2014. The defendant's direct appeal was consolidated with his appeal from the denial of his motion for a new trial, and raised all the arguments that he made in that motion. He also challenged the denial of his motion for postconviction discovery, and asked that this court exercise its extraordinary powers to reduce the degree of guilt. As stated, we remanded the matter to the Superior Court so that a limited evidentiary hearing could be conducted, at which trial counsel could be summonsed to testify.

d. _Proceedings on remand_. Pursuant to the order of remand, a hearing was conducted in April, 2015, at which trial counsel testified regarding the telephone records[10] and the decision not to introduce any evidence suggesting that the defendant had been intoxicated on the evening of the shooting. Trial counsel testified that the main reason he had not introduced evidence of the defendant's intoxication was because

---

[10] Trial counsel testified at the April, 2015, evidentiary hearing that he had a "clear memory of being satisfied" that the telephone call that was the subject of the defendant's motion for posttrial discovery took place, but that he did not have a copy of the relevant telephone records. Following that hearing, the Commonwealth complied with our subsequent order compelling it to produce the records in question so that it would be possible to determine whether a call had taken place between the victim and Kenyisha on the evening of the shooting. The Commonwealth produced the records in question, which confirmed that Kenyisha had spoken with the victim for approximately twelve minutes around 11:30 P.M. that evening.

it could have provided the jury with an incentive to find the defendant guilty of murder in the second degree. When pressed, trial counsel stated that he decided not to introduce the intoxication evidence because he was "going for all the marbles" -- i.e., an acquittal -- and that he had been concerned that introducing evidence of intoxication evidence might run counter to achieving that result.

The second motion judge[11] ultimately denied the defendant's motion for a new trial. Applying the standard set out by this court in Commonwealth v. Saferian, 366 Mass. 89 (1974), he concluded that trial counsel's failure to introduce the intoxication evidence was "manifestly unreasonable," but that it did not deprive the defendant of a substantial ground of defense or affect the jury's verdict. Although the judge credited counsel's explanation that his goal had been an outright acquittal, the judge noted that this strategy was undercut by trial counsel's successful request for a jury instruction concerning involuntary manslaughter. Moreover, the judge observed that evidence of intoxication "would have supported [counsel's pursuit of an outright acquittal] by giving the jury a reason to believe that the defendant did not realize the safety was disengaged."

---

[11] The judge who conducted the evidentiary hearing was not the trial judge, who initially had denied the defendant's motion for a new trial. The trial judge had since retired.

He ultimately denied the defendant's motion for a new trial, however, because he determined that "a good deal of evidence to support the defendant's argument that the shooting was an accident" had been elicited at trial, and that the omission of the intoxication evidence "did not deprive the defendant of that defense" nor, given the strong evidence of the defendant's motive, "change[] the result of the trial."

2. Discussion. a. Ineffective assistance. On appeal, the core of the defendant's claim of ineffective assistance remains trial counsel's failure to introduce evidence suggesting that the defendant was intoxicated on the night of the victim's death. The defendant also argues that trial counsel's decision not to object to repeated references to the defendant's name being listed on MassMostWanted, and his failure to move to strike a nonresponsive answer by the medical examiner, constituted ineffective assistance. We consider each claim in turn.

Pursuant to G. L. c. 278, § 33E, "we consider claims of ineffective assistance to determine 'whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion.'" Commonwealth v. Spray, 467 Mass. 456, 472 (2014), quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

Should we determine "that counsel erred by failing to raise a substantial defense, 'a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same' [citation omitted]." Commonwealth v. Sena, 429 Mass. 590, 595 (1999), cert. denied, 441 Mass. 822 (2004).

i. Intoxication evidence. When a defendant raises a claim of ineffective assistance of counsel where the case is reviewed under G. L. c. 278, § 33E, we do not consider the adequacy of trial counsel's performance pursuant to Saferian, 366 Mass. at 96, but, rather, consider whether there was "an error in the course of the trial." Wright, 411 Mass. at 682. "A strategic decision by an attorney . . . constitutes error 'only if it was manifestly unreasonable when made.'" Commonwealth v. Alcequiecz, 465 Mass. 557, 562-563 (2013), quoting Commonwealth v. Jenkins, 458 Mass. 791, 804-805 (2011). We agree with the second motion judge that, in light of all the circumstances, trial counsel's strategic decision not to introduce evidence of the defendant's intoxication on the night of the shooting was manifestly unreasonable and was thus error. Because we are substantially confident that, had this error not been made, the jury verdict would have stayed the same, however, we discern no error in the denial of the renewed motion for a new trial.

As to trial counsel's strategic decision regarding evidence of the defendant's intoxication, the record makes plain that trial counsel did not pursue an all-or-nothing strategy. Trial counsel successfully argued, over the Commonwealth's objection, for an instruction concerning involuntary manslaughter, and mentioned -- albeit briefly -- that theory in his closing argument. Evidence that the defendant was intoxicated could have undercut the Commonwealth's theory that the shooting was intentional, see, e.g., Commonwealth v. Sama, 411 Mass. 293, 298 (1991),[12] and thereby have given the jury more of a basis to find the defendant guilty of involuntary manslaughter rather than murder in the first degree by deliberate premeditation.

Further, we are unpersuaded that the intoxication evidence would have detracted in any meaningful way from the primary defense of accident. The defendant's accident defense rested on the Montrond family's testimony concerning the defendant's reaction to the shooting. This was a slender reed. The jury heard no theory as to how the defendant came to be handling a loaded firearm in the basement of his parents' house, or why he pulled the trigger while the victim was sitting on a couch and

---

[12] Although the parties dispute whether Ford's testimony would have been sufficient to warrant an instruction on intoxication, even without such an instruction, the jury independently could have concluded that the consumption of alcohol gave rise to a reasonable doubt whether the defendant formed an intent to kill, and with deliberate premeditation.

the gun was aimed at her head.  Without the intoxication evidence, and in the face of strong evidence as to motive, the jury were left with essentially two ways of understanding the shooting:  inexplicable carelessness or an intended act.  As the second motion judge concluded, evidence suggesting that the defendant was intoxicated at the time of the shooting likely would have bolstered his case for acquittal by giving the jury a plausible explanation as to how he could have accidentally pulled the trigger.

In this regard, we also recognize that the jury could have deemed the defendant reckless irrespective of his alcohol consumption, and guilty of murder in the second degree or of involuntary manslaughter.  Leveling a gun at point blank range at a victim's head without first ascertaining whether the safety is on could certainly satisfy the Welansky standard for wanton or reckless conduct, i.e., when an "ordinary normal man under the same circumstances would have realized the gravity of the danger."  Commonwealth v. Welansky, 316 Mass. 383, 398-399 (1944).  In light of all this, the defendant had very little to lose, and something to gain, by introduction of the intoxication evidence.  All in all, trial counsel's strategic decision not to present evidence suggesting that the defendant was intoxicated on the night of the killing was "manifestly unreasonable." Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006).

Nonetheless, this error does not require a new trial. In light of all the evidence and the strength of the Commonwealth's case, we are substantially confident that the jury's verdict would have been the same had the error not been made and the intoxication evidence instead introduced. Most significantly, there was solid evidence of the defendant's motive, lessening the impact of any potential intoxication as the explanation for the shooting. The Commonwealth presented compelling evidence that the defendant shot the victim in revenge for having turned him in to police -- most notably Kenyisha's testimony that the defendant had referred to the victim as a "snitch" shortly before her death, which was largely unrefuted.[13]

Even if the Commonwealth's evidence of motive had been less powerful, the proffered intoxication evidence likely would not have been strong enough, standing alone, to change the jury's verdict. That evidence of intoxication was tepid at best, consisting only of one first responder's somewhat equivocal description of a detected hybrid odor: "reek[ing] of B.O., like sweat and B.O., and of alcohol," along with observed emotionally freighted behavior consistent with causes that may or may not

---

[13] The inconsistencies emphasized by trial counsel on cross-examination did little to mitigate Kenyisha's testimony. Although her account of the telephone call with the victim on the night of the shooting varied slightly, she consistently stated that, with whatever adjectives, the defendant had called the victim a "snitch."

have been alcohol related. This hardly would have given rise to a compelling inference that the defendant was so intoxicated he could not appreciate the need to check the safety lock before pointing a loaded gun at someone's head and pulling the trigger.[14] See, e.g., Commonwealth v. Mountry, 463 Mass. 80, 93 (2012).

Accordingly, although the intoxication evidence could have been somewhat helpful to the defendant's case and should have been introduced, we are substantially confident that, had it been introduced, the jury's verdict would have been the same. The failure to introduce this evidence does not warrant a new trial.

ii. MassMostWanted. The defendant contends that his trial counsel's failure to object to references to the Internet Web site, MassMostWanted, also constituted the ineffective assistance of counsel. Two such references were in Kenyisha's testimony at trial and one was in the Commonwealth's closing argument; trial counsel did not object to any of these references.

"It is long established that evidence of uncharged criminal acts or other misbehavior is not admissible to show a

---

[14] In addition, the Commonwealth also argued that the defendant had placed the safety lock back in place after killing the victim in support of its contention that the shooting was not accidental.

defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as 'common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive.'" Commonwealth v. Barbosa, 457 Mass. 773, 793 (2010), cert. denied, 563 U.S. 990 (2011), quoting Commonwealth v. Dwyer, 448 Mass. 122, 128 (2006). This rule reflects the "inherent danger" that a jury will assume that, because a defendant has previously misbehaved in some way, he "must have committed the crime charged." See id. at 793-794. Nonetheless, "[e]ven if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).

Applying these principles to the present case, it was error for trial counsel not to have objected to the references to MassMostWanted, which were more prejudicial than probative. The defendant's potential motive for killing the victim was well established by evidence demonstrating his awareness that the victim had turned him in to police. Whatever minor probative value the references might have had in bolstering evidence of motive was outweighed by the potential prejudice to the defendant. The jury likely would infer from the references to MassMostWanted that the defendant was what the Web site said --

one of the Commonwealth's most wanted fugitives -- and therefore that he was accused of committing a serious crime similar to the one that he was accused of in this case.

Notwithstanding this, we are "substantially confident" that the references to MassMostWanted did not alter the jury's verdict (citation omitted).  See Commonwealth v. Alcide, 472 Mass. 150, 157 (2015).  In his final charge, the judge gave a curative instruction, helping to alleviate the prejudice from the statements.  See Commonwealth v. Costa, 69 Mass. App. Ct. 823, 827 (2007).  In addition, given the properly introduced testimony that Massachusetts police went to South Carolina to pick up the defendant, the jury reasonably could have inferred that the defendant's other alleged crimes were quite serious. Most significantly, the strength of the Commonwealth's case, and the weight of the other evidence, cuts against the potential impact of the error.

iii.  Medical examiner's testimony.  The defendant argues that his trial counsel provided ineffective assistance by failing to move to strike a statement by the medical examiner. We disagree.  On cross-examination, the medical examiner was asked if the path of the bullet allowed her to opine whether the shooting was intentional or accidental; she responded, "My opinion on this case is that it's a homicide."  In response to further probing questions by trial counsel, she clarified that

her observations of the victim's wound, including the path of the bullet and the close range from which the shot was fired, did not permit her to say whether the shooting was intentional or accidental.[15]  The motion judge found that, although the medical examiner's statement was improper, trial counsel ameliorated the harm by his following inquiries.  Although a medical examiner generally may not offer an opinion that a death is a homicide, it is apparent from the record that trial counsel's effective cross-examination caused the medical examiner to recant her opinion shortly after she offered it.

b.  Confrontation clause.  The defendant contends also that other testimony elicited from the medical examiner violated the defendant's right of confrontation under the Sixth Amendment.  The medical examiner testified to the results of a toxicology report created by another analyst pursuant to the autopsy on the victim, which showed that the victim had a blood alcohol level of .04, and the equivalent of two or more doses of oxycodone in her system at the time of her death.  "The confrontation clause bars the admission of testimonial out-of-court statements by a witness who does not appear at trial unless the witness is

---

[15] Immediately after the medical examiner's statement that she believed the shooting was a homicide, trial counsel asked her, "Did you understand my question . . . ?" to which she responded, "Not particularly."  Shortly thereafter, trial counsel asked whether, based on the evidence, she could tell if the shooting had been accidental or intentional, and she replied, "Absolutely not."

unavailable to testify and the defendant had an earlier opportunity for cross-examination."  Commonwealth v. Irene, 462 Mass. 600, 617, cert. denied, 133 S. Ct. 487 (2012).  See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-311 (2009) (confrontation clause applies to certificates of drug analysis admitted to prove substances are illegal drugs).  A violation of the right to confrontation requires a new trial unless it can be established, "beyond a reasonable doubt, that the erroneously admitted [evidence] had little or no effect on the verdicts." Commonwealth v. Vasquez, 456 Mass. 350, 362 (2010).

The first motion judge concluded that the testimony concerning the specific findings in the toxicology report violated the defendant's right of confrontation, but that the error was harmless beyond a reasonable doubt because it did not have any impact on the verdict.  The Commonwealth does not dispute that the testimony concerning the results of the toxicology report was testimonial but contends that the motion judge correctly determined that such error was harmless. Assuming without deciding that it was error to admit the testimony in question,[16] we agree that any such error was

_____

[16] The issue whether evidence akin to the toxicology reports is testimonial admits of different views.  Compare Commonwealth v. Lezynski, 466 Mass. 113, 116 (2013) (expert witness reading verbatim into record toxicology report created by another violated right of confrontation of defendant charged with possession of class B substance with intent to distribute), and

harmless beyond a reasonable doubt.  See Vasquez, 456 Mass. at 362.

The results of the toxicology report supported the Commonwealth's testimony that the victim was asleep when the shooting occurred.  It was uncontested at trial, however, that, at the time of the shooting, the victim was reclining on a sofa, with a blanket draped over her, at approximately 1 A.M.  Hence, the jury separately had good reason to believe that she had been asleep at the time of the shooting regardless of the precise amount of alcohol and oxycodone in her system; in any event, the issue whether the victim was asleep appears not to have been contested at trial.

c.  Review under G. L. c. 278, § 33E.  Having reviewed the entire record in accordance with our duty under G. L. c. 278, § 33E, we discern no reason to reduce the degree of guilt or to order a new trial.

Judgments affirmed.

---

United States v. Ignasiak, 667 F.3d 1217, 1232 (11th Cir. 2012) (autopsy report testimonial because "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [citation omitted]), with United States v. James, 712 F.3d 79, 101-102 (2d Cir. 2013), cert. denied, 134 S. Ct. 2660 (2014) (toxicology report was nontestimonial because "[t]here [was] no indication . . . in the record that a criminal investigation was contemplated during the inquiry into the cause of [the victim's] death"), and People v. Leach, 2012 IL 111534, ¶¶ 128-138 (autopsy reports not testimonial).

LOWY, J. (concurring).  I agree with the court's analysis and resolution of the issues in this case.  I write separately to make explicit that the court does not decide whether, as a general matter or on the facts of this case, the toxicology report of the victim constitutes testimonial hearsay, such that the defendant would have a right to confront the particular individual who prepared the report.  If such a report is not testimonial, and is otherwise admissible as a business record, an expert witness may reference the report's context during direct testimony.

In Massachusetts, an expert may not testify on direct examination to facts that are not in evidence.[1]  See Commonwealth v. Nardi, 452 Mass. 379, 391-393 & n.13 (2008); Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986).  See also Mass. G. Evid. § 703 (2017).  Whether a toxicology report itself, however, created as part of a routine autopsy, constitutes testimonial hearsay is, in my view, an open question.  Compare United States v. Ignasiak, 667 F.3d 1217, 1231-1232 (11th Cir. 2012) (autopsy reports testimonial because "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [citation omitted]), with State v. Mattox,

---

[1] Of course, an expert may testify to facts of which he or she has personal knowledge, if the testimony is otherwise admissible.

373 Wis. 2d 122, 136, 145 (2017) (toxicology report requested by medical examiner conducting autopsy was not testimonial because "primary purpose was to identify the concentration of the tested substances in biological samples . . . as part of [the] autopsy to determine the cause of death -- not to create a substitute for out-of-court testimony or to gather evidence . . . for prosecution"), and People v. Leach, 2012 IL 111534, ¶ 137 (autopsy report not testimonial because primary purpose was not to provide evidence in criminal case).

The court does not -- and need not -- resolve today whether a toxicology report itself conducted as part of an autopsy constitutes testimonial hearsay. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009) ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case"). See also Williams v. Illinois, 567 U.S. 50, 86 (2012) (Breyer, J., concurring) (raising "difficult, important" question as to "[h]ow . . . the [c]onfrontation [c]lause appl[ies] to the panoply of crime laboratory reports and underlying technical statements written by [or otherwise made by] laboratory technicians"). If such a report does not constitute testimonial hearsay and is otherwise properly admitted in evidence, an expert would be permitted to

testify to its contents during direct examination.  See <u>Nardi</u>,

452 Mass. at 391-393 & n.13.