# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2019 Term**

_____

**No. 17-0566**

_____

**FILED**

**June 10, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Mark T. Coleman,**
**Petitioner Below, Petitioner**

**V.**

**J.T. Binion, Superintendent,**
**Huttonsville Correctional Center,**
**Respondent Below, Respondent**

_____

**Appeal from the Circuit Court of Kanawha County**
**Honorable Charles E. King, Judge**
**Civil Action No. 14-P-583**
**AFFIRMED**

_____

**Submitted:  January 9, 2019**
**Corrected Opinion Filed:  June 10, 2019**

Kevin D. Mills                           Patrick Morrisey, Attorney General
Shawn R. McDermott                       Scott E. Johnson, Assistant Attorney
Mills McDermott, PLLC                    General
Martinsburg, West Virginia               Charleston, West Virginia
Attorneys for the Petitioner             Attorneys for the Respondent

**JUSTICE JENKINS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review.  We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review."  Syllabus point 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

2.      "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984):  (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Syllabus point 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

3.      "In deciding ineffective . . . assistance [of counsel] claims, a court need not address both prongs of the conjunctive standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995), but may dispose of such a claim based solely on a petitioner's failure

i

to meet either prong of the test." Syllabus point 5, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995).

4. "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syllabus point 6, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995).

5. "A judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syllabus point 5, *State v. Ocheltree*, 170 W. Va. 68, 289 S.E.2d 742 (1982).

6. "Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as it accurately reflects

the law. Deference is given to the circuit court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed for an abuse of discretion." Syllabus point 15, *State v. Bradshaw*, 193 W. Va. 519, 524, 457 S.E.2d 456, 461 (1995).

7.     ""'"In a homicide trial, malice and intent may be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which the jury does not believe afforded the defendant excuse, justification or provocation for his conduct. Whether premeditation and deliberation may likewise be inferred, depends upon the circumstances of the case." Point 2, Syllabus, *State v. Bowles*, 117 W. Va. 217[, 185 S.E. 205 (1936)].' *Syllabus, State v. Johnson*, 142 W. Va. 284, 95 S.E.2d 409 (1956)." Syllabus point 5, *State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994).

8.     "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syllabus point 21, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974).

9.     "Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia

iii

Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence." Syllabus point 3, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

10. "Before a trial court can determine that evidence of collateral crimes is admissible under one of the exceptions, an in camera hearing is necessary to allow a trial court to carefully consider the admissibility of collateral crime evidence and to properly balance the probative value of such evidence against its prejudicial effect." Syllabus point

3, *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986), *overruled on other grounds by State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

11.     "Errors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction."  Syllabus point 20, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974).

12.     "In a criminal case, the burden is upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Syllabus point 3 *State v. Frazier*, 229 W. Va. 724, 725, 735 S.E.2d 727, 728 (2012).

**Jenkins, Justice:**

In this case, Mark T. Coleman ("Mr. Coleman") appeals an order of the Circuit Court of Kanawha County denying his petition for writ of habeas corpus, which asserted numerous grounds to support his claims of ineffective assistance of both trial and appellate counsel.[1] After reviewing the parties' briefs, the legal authority cited, and the record submitted for our consideration; as well has hearing the oral arguments presented, we affirm the circuit court's denial of Mr. Colman's habeas petition.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In the case underlying the instant habeas corpus proceeding, Mr. Coleman was tried by a jury and convicted of murder in the first degree for fatally shooting his wife, Trina Coleman ("Mrs. Coleman"). He was sentenced to life with mercy.

---

[1] The original petition named the respondent as Marvin C. Plumley, Warden of the Huttonsville Correctional Center ("Warden Plumley"). We note that the title "warden" has been replaced. Effective July 1, 2018, positions formerly designated as "warden" became designated as "superintendent." *See* W. Va. Code § 15A-5-3 (LexisNexis 2014 & Supp. 2018). Moreover, during the course of these proceedings, Warden Plumley was replaced by John T. Murphy, who served as Acting Superintendent. Thereafter, J.T. Binion was appointed as Superintendent of Huttonsville. Accordingly, pursuant to Rule 41 of the Rules of Appellate Procedure, Mr. Binion has been substituted as the Respondent in this appeal.

The evidence presented at trial established that, on March 2, 2006, in the course of a dispute over Mrs. Coleman's marital fidelity, Mr. Coleman shot his wife in the face with a rifle. Mr. Coleman never disputed that he shot his wife; thus, the primary issue of contention during the trial was Mr. Coleman's intent. The State presented evidence to establish that Mr. Coleman shot his wife with the specific intent to end her life because he believed she was having an extramarital affair, and further believed that she was conspiring with her alleged paramour, David, to harm or kill Mr. Coleman and other members of his family. Mr. Coleman's counsel[2] presented a defense based upon the theory that the shooting had been accidental in that Mr. Coleman did not believe the rifle was loaded. The defense also contended that, at the time of the shooting, Mr. Coleman was suffering from diminished capacity due to methamphetamine psychosis and was, therefore, unable to form the intent to commit murder.

The evidence supporting the jury verdict with respect to Mr. Coleman's intent included numerous letters written by Mr. Coleman accusing Mrs. Coleman of infidelity. Some of the letters contained threats against Mrs. Coleman. Also, on the coffee table in the room where Mrs. Coleman was shot, was a date book belonging to Mrs.

---

[2]Mr. Coleman retained James Cagel as his trial counsel.

2

Coleman. The date book contained several entries of the name "David," and each entry was accompanied by a drawing of a heart.

There also was evidence of prior physical violence involving Mr. and Mrs. Coleman, including an incident that resulted in each of them obtaining a domestic violence protective order against the other and caused Mrs. Coleman to move out of the marital home. The Coleman's daughter testified to another incident that occurred within two or three months of her mother's death. The daughter had overheard an argument between her parents during which Mr. Coleman, while holding a rock in his hand, threatened to kill Mrs. Coleman. There was additional testimony from the Coleman's daughter that Mr. Coleman was a hunter who was knowledgeable about firearms, thus refuting Mr. Coleman's claim that he was mistaken about whether the murder weapon was loaded. She further stated that Mr. Coleman stored all of his rifles, including the murder weapon, unloaded in a gun cabinet located in the couple's bedroom. The State also presented testimony from a firearm examiner, Phillip Cochran, who had tested the murder weapon. Mr. Cochran testified that the rifle was equipped with a trigger safety device that prevented it from discharging without the trigger being pulled. Testing confirmed that the trigger safety device on the rifle was functioning as designed, so that the weapon would not fire without the trigger being pulled.

3

Other testimony established that Mrs. Coleman was working at a local convenience store on the evening of her death when she received a phone call from Mr. Coleman. After the call, Mrs. Coleman was visibly upset and informed the store manager that she needed to go home. Shortly thereafter, while in a back room of their marital home, Mr. Coleman shot Mrs. Coleman in the face from a close distance, estimated to be between six and twelve inches. Mrs. Coleman sustained a massive head wound from the shot, and also suffered a defensive wound that nearly severed one of her fingers.

With respect to Mrs. Coleman's injuries, a State medical examiner, Dr. Boiko, testified on behalf of the prosecution regarding his autopsy of the victim and his resulting report. The medical examiner explained that an injury to Mrs. Coleman's left ring finger was a defensive wound and indicated that the bullet had first hit her finger before entering her head through her mouth. Although the medical examiner's report stated that there was no gun powder residue on the victim's left ring finger, upon viewing a picture of the injured finger during his testimony, the medical examiner observed that there was, in fact, gun powder soot on the finger. The presence of this soot indicated that Mrs. Coleman's hand had been in close proximity to the rifle's muzzle at the time it discharged. Thus, the medical examiner's written report had been incorrect, but he corrected his conclusion during his testimony. While Dr. Boiko opined that Mrs. Coleman's finger was in close proximity to the rifle when it was discharged, he stated that he could neither conclude nor rule out the possibility that her finger had come into contact with the rifle.

4

Although Mr. Coleman exercised his right to not testify, during the course of the trial, the jury nevertheless heard evidence from several sources that, following the shooting, Mr. Coleman repeatedly claimed that the shooting was an accident. Mr. Coleman contended that he had waived the rifle at Mrs. Coleman in an attempt to scare her and he did not believe that it was loaded.[3] During the defense case-in-chief, Mr. Coleman's ballistics expert opined that the presence of soot on Mrs. Coleman's finger and the location of bullet fragments found at the scene were consistent with a scenario where Mrs. Coleman pushed or swatted the muzzle of the rifle causing it to discharge. The expert testified that, if Mr. Coleman had the trigger squeezed and his thumb on the hammer, simultaneous contact with the muzzle by Mrs. Coleman could have caused the rifle to discharge.

The jury ultimately found Mr. Coleman guilty of first-degree murder and recommended mercy. Mr. Coleman filed post-trial motions, which were denied by the circuit court. Mr. Coleman then appealed his conviction to this Court[4] and was granted oral presentation of the sole issue raised, *i.e.*, the sufficiency of the evidence. This Court,

---

[3]Mr. Coleman's statements were admitted during the State's case-in-chief through the admission of an audio recording that was made at the scene and during Mr. Colman's transport to the sheriff's headquarters, and a video recording of his statement made to law enforcement after he arrived at the sheriff's headquarters. During Mr. Coleman's case, testimony regarding his statements indicating the shooting was an accident was provided by his father and his neighbor/landlord.

[4]Appellate counsel was Troy Giatras.

5

by order entered on October 9, 2008, refused the petition for appeal.[5]  Thereafter, in

November 2014, Mr. Coleman filed a petition for writ of habeas corpus in the Circuit Court

of Kanawha County.  Following an omnibus hearing, the circuit court denied the petition

by order entered on May 26, 2017.  This appeal followed.  Additional facts specifically

related to the assignments of error herein raised will be set out in our discussion of the

particular issues to which they pertain.

## II.

## STANDARD OF REVIEW

The instant appeal is before this Court from a circuit court's denial of a

petition for a writ of habeas corpus.  The proper standard for our review of such an appeal

has been set out as follows:

> In reviewing challenges to the findings and conclusions
> of the circuit court in a habeas corpus action, we apply a three-
> prong standard of review.  We review the final order and the
> ultimate disposition under an abuse of discretion standard; the
> underlying factual findings under a clearly erroneous standard;
> and questions of law are subject to a *de novo* review.

Syl. pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).  Moreover, each of

the grounds asserted by Mr. Coleman as entitling him to a writ of habeas corpus are asserted

---

[5]The West Virginia Rules of Appellate Procedure in effect at the time of Mr. Coleman's appeal allowed this Court to refuse a petition for appeal.  *See* W. Va. R. App. Pro. 7 (as amended by order entered on June 14, 1995).

as a basis for his claim of ineffective assistance of counsel. In reviewing a circuit court's ruling as to a claim of ineffective assistance of counsel, we are mindful of the following standard:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). We also have clarified that if either prong of the test is absent, ineffective assistance is not established:

> In deciding ineffective . . . assistance [of counsel] claims, a court need not address both prongs of the conjunctive standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995), but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.

Syl. pt. 5, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995). Further,

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would

7

have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. pt. 6, *id.* Finally,

[t]he test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

*Miller*, 194 W. Va. at 16, 459 S.E.2d at 127.

We will apply the foregoing standards generally to our consideration of this appeal. Additional standards for our review that are applicable to specific issues herein raised will be addressed in connection with our consideration of those issues.

## III.

## DISCUSSION

Mr. Coleman raises eight separate instances of ineffective assistance of counsel in this appeal.[6] We address each one in turn.[7]

### A. Failure to Object During Closing Arguments

Mr. Coleman first argues that his trial counsel was ineffective by failing to object to remarks made during closing argument that Mr. Coleman characterizes as improper comments on his right to remain silent. In addition, he claims that appellant counsel was ineffective in failing to raise this issue in his direct appeal.

---

[6] As a ninth assignment of error, Mr. Coleman claims that the cumulative effect of the errors he has raised prejudiced his constitutional rights and rendered his trial unfair. Because we find no prejudicial errors, we decline to address this issue. *See State v. Trail*, 236 W. Va. 167, 188 n.31, 778 S.E.2d 616, 637 n.31 (2015) ("Because we have found no errors, this assignment need not be addressed.").

[7] On March 11, 2019, Mr. Coleman filed a notice of additional authority asking this court to consider the case of *Garza v. Idaho*, ___ U.S. ___, 139 S. Ct. 738, 203 L. Ed. 2d 77 (2019). *Garza* recognized, in the context of a guilty plea where the defendant signed an appeal waiver, a presumption of prejudice where an attorney's deficient performance in failing to file a notice of appeal deprived the defendant of an appeal that the defendant would otherwise have pursued. *Id.* Because this matter does not involve a guilty plea or the failure of counsel to file a notice of appeal, *Garza* has no application.

9

During its closing, the State made the following argument with no objection from Mr. Coleman's trial counsel:

> Now, the defense would have you believe that this was an accident. First of all, just because the defendant has said it was an accident, doesn't mean that it was an accident. And why is it not an accident? Because his explanation does not fit the physical facts at the scene of the crime. His explanation that he wasn't aiming the gun, that he was standing there, that he was merely pulling the hammer back, and that his thumb slipped off the hammer, does not cause a discharge of the firearm. It does not fit the physical facts of the case.
>
> The medical examiner told you that she had her left hand in front of her face. A defensive wound. And that she was trying to defend herself by putting her hand in front of her face. *It is not an accident because he did not tell you that she was attempting to defend herself.* His explanation does not fit the physical facts of this case.

(Emphasis added). Mr. Coleman's trial counsel then presented his closing argument wherein he referred to Exhibit 52, which was a video recording of a police interview with Mr. Coleman. Trial counsel argued that, in the recording, Mr. Coleman waivered as to whether he had the trigger of the riffle squeezed, ultimately conceding, according to counsel, that he may "have had the trigger squeezed and pulled the hammer and it slipped." The State, during its rebuttal closing, responded to the argument posed by trial counsel as follows:

> Ladies and gentlemen, I would urge you if you're going to examine Exhibit 52 to watch the whole thing. It needs to be played in its entire context. Because this defendant has made a series of inconsistent statements, and that's what those are, inconsistent statements. And they are self-serving. They

10

aren't admissions that he has done something wrong. They are denials that he has done something wrong.

He has never stepped up during the statement to the police and said that she had her hand up, as the medical examiner said she must have had. He has not and did not tell the entire story *during his statement to the police*

. . . .

Every theory that they have put forward to their experts of how the gun discharged requires you to go through an exercise of coincidences, which, I submit to you, are unworthy of your consideration. *Because he has never described to a single individual that he pulled that trigger. He says he may have. "Maybe I did." He also says, "I didn't do it. I never did it." A series of inconsistent statements.*

The medical examiner told you that the distance from the muzzle of the gun to the hand was close proximity. He did not say that it was contact. He said it was possible that it was contact. And that is a big difference. And even if it was contact, even if it was contact, it does not follow that the victim, Trina Coleman, caused the gun to discharge. That is something – that's a leap and speculation and conjecture that [trial counsel] wants you to do. And the Judge has told you not to engage in conjecture and speculation.

*This defendant did not tell the police that he was attempting to render the gun safe by lowering the hammer and squeezing the trigger. This defendant did not tell you that he was attempting to render the gun safely when Trina Coleman was attempting to push the gun away.*

(Emphasis added).

At the omnibus hearing, Mr. Coleman's trial counsel testified as follows regarding his decision to not object to the foregoing comments:

11

Well, the question, when to object to that, is a delicate one. Do you call it to the attention of the jury? Do you just go with the instruction – and that's – that's the thought process I engage in in any case, and I'm sure that was my thought process then. And just like the other, the record says what it says. That could be gleaned to be plain error under some, you know, some of the authority. Other of the authority said you read it in the context of what else was being done and instructed and the circumstances of the case. So that can go either way.

Based upon the explanation provided by Mr. Coleman's trial counsel, the circuit court reasoned and concluded as follows:

75. The prosecuting attorney in closing and rebuttal made brief and fleeing reference to what [Mr. Coleman] had not told "you." The court finds that argument to be regrettable, and does not approve of those statements. However, the issue before the court is whether or not trial counsel was ineffective for not objecting to those remarks, and whether appellate counsel was ineffective in failing to include those remarks as plain error in his petition for appeal.

76. Although [Mr. Coleman's] expert [on the adequacy of trial counsel] opined that he couldn't see a strategic reason for not interposing an objection to those portions of the argument, trial counsel did proffer a strategic reason, and a sound one. As noted, the issue of objecting is a delicate one. [Mr. Coleman's] expert agreed that it was often a sound choice to leave well enough alone. Trial counsel stated he did not want to object because, in essence, an objection ran the risk of emphasizing to the jury something that might damage his client. Even had counsel objected, and asked to approach the bench to discuss the objection in a side bar, the remedy would have been essentially for the court to tell the jury to disregard any remark that the prosecutor made about what the petitioner (did) or didn't say.

77. The court determines that it was not objectively deficient performance for counsel to make a strategic decision

12

not to object to those remarks. Further, the court believes that[,] had counsel objected, and the jury been instructed to disregard—even if the prosecutor had been admonished—the jury would still have convicted the petitioner of murder in the first degree. Therefore, neither prong of *Strickland/Miller* is satisfied.

This Court has recognized that, "[r]emarks made by the State's attorney in closing argument which make specific reference to the defendant's failure to testify, constitute reversible error and defendant is entitled to a new trial." Syl. pt. 5, *State v. Green*, 163 W. Va. 681, 260 S.E.2d 257 (1979). In other words,

> "[i]t is prejudicial error in a criminal case for the prosecutor to make statements in final argument amounting to a comment on the failure of the defendant to testify." Syllabus Point 3, *State v. Noe*, 160 W. Va. 10, 230 S.E.2d 826 (1976), *overruled on other grounds by State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

Syl. pt. 4, *State v. Murray*, 220 W. Va. 735, 736, 649 S.E.2d 509, 510 (2007). Nevertheless, "[a] judgment of conviction *will not be reversed* because of improper remarks made by a prosecuting attorney to a jury *which do not clearly prejudice the accused or result in manifest injustice.*" Syl. pt. 5, *State v. Ocheltree*, 170 W. Va. 68, 289 S.E.2d 742 (1982) (emphasis added). *Accord* Syl. pt. 1, *State v. Adkins*, 209 W. Va. 212, 544 S.E.2d 914 (2001).

The comments at issue did not clearly prejudice Mr. Coleman or result in manifest injustice. When taken in context, the prosecuting attorney's comments regarding

13

what the defendant told or failed to tell the jury clearly were references to what Mr. Colman

had said in his recorded statements, statements that had been presented to the jury. This is

particularly true of the prosecutor's statements made in response to Mr. Coleman's trial

counsel's argument encouraging the jury to consider exhibit 52, the recorded interview

with Mr. Coleman. The portion of the State's rebuttal closing addressing exhibit 52 merely

urged the jury to consider the exhibit in full and pointed out that the recording depicted a

series of inconsistent comments made by Mr. Coleman. The State's closing arguments

simply were not a comment on Mr. Coleman's failure to testify.

> Moreover, the jury was properly instructed that

>> [t]he defendant Mark Thomas Coleman, has no duty to take the stand as a witness in his own behalf. And if he does not do so, this is not evidence, and you should draw no inference therefrom as to his guilt or innocence. You should entirely disregard and not discuss it.

The jury also was instructed that,

>> [n]othing said or done by the attorneys who have tried this case is to be considered by you as evidence of any fact. The opening statements that you heard last week, and the final arguments that you're going to hear here in a few moments, are intended to help you in understanding the evidence and applying the law to the evidence but they are not themselves evidence. And accordingly, if any arguments, statements or remark of any of the lawyers is not based upon the evidence or the law as stated in my instructions, then you should disregard that statement, argument or remark.

14

Assuming *arguendo* that the jury might have misunderstood the arguments, such a misunderstanding would have been cured by the instructions given, which plainly directed the jury that no inference should be drawn from Mr. Coleman's decision to not testify and, further, that any comments made by counsel were not evidence, and any such comments that were not based upon the evidence presented should be disregarded.

This Court has observed that "[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction." Syl. Pt. 20, *State v. Thomas*, 157 W. Va. 640, 643, 203 S.E.2d 445, 449 (1974). As set out in the facts above, there was overwhelming evidence of Mr. Coleman's guilt. Thus, even if error had occurred, "there was no reasonable possibility that the violation contributed to [Mr. Coleman's] conviction." *Id.* Accordingly, we conclude that the circuit court correctly denied habeas relief on the basis of ineffective assistance of trial counsel arising from trial counsel's failure to object to the State's comments during closing arguments. Likewise, because we find there was no error made at trial, we conclude that the circuit court also was correct in denying habeas relief on the ground of ineffective assistance of appellate counsel based upon appellate counsel's failure to raise this issue on appeal.

## B. Permissible Inference

The jury sitting for Mr. Coleman's criminal trial was instructed that "[i]ntent, willfulness, deliberation, and malice *may be inferred* from the intentional use of a deadly weapon *under circumstances where the defendant does not have excuse, justification, or provocation for his conduct*."  (Emphasis added).  In addition, during closing arguments, the prosecuting attorney commented as follows:

> Ladies and gentlemen—and I submit to you that you do not even cock the hammer of a gun, especially one that contains hollow-point bullets, unless you intend to fire it.  And the judge has told you that use of the firearm can be construed as evidence he intended to fire the gun.

Mr. Coleman argues that this instruction allowing an inference on the element of intent[8] from his use of a firearm, along with the comment made by the prosecutor referring to the inference during closing argument, improperly shifted the burden of proof to Mr. Coleman on the issue of whether the shooting was accidental or intentional.  He claims that his trial counsel's failure to address these issues was ineffective,

---

[8] In *State v. Jenkins*, this Court explained, as follows, that the term "malice" is often used as a substitute for "specific intent":

> We discussed the concept of malice in *State v. Hatfield*, 169 W. Va. 191, 198, 286 S.E.2d 402, 407 (1982), and stated that it "is often used as a substitute for 'specific intent [to] kill' or 'an intentional killing.'"  Citing *State v. Starkey*, 161 W. Va. 517, 523, 244 S.E.2d 219, 223 (1978), and other cases.

*Jenkins*, 191 W. Va. 87, 92, 443 S.E.2d 244, 249 (1994) (footnote omitted).

16

and his appellate counsel's failure to raise this issue on appeal likewise was ineffective. The State contends that the instruction was not infirm and the instructions, when read as a whole, were proper. Therefore, trial counsel was not ineffective in failing to object, and appellate counsel was not ineffective in failing to raise this issue on appeal. The State additionally refers again to the trial court's instruction stating that any comments made by the attorneys were not evidence, and any such comments that were not based upon the evidence presented should be disregarded.[9]

In addressing the instruction in the habeas proceeding, the circuit court concluded that it was a correct statement of the law. In reaching this conclusion, the circuit court reasoned as follows:

> 62.     The instruction in question in this matter did not shift any burden of proof or persuasion to the petitioner, and did, in fact, inform the jury that it could infer malice from the use of the deadly weapon if, and only if, they found that the circumstances did not afford the defendant justification, excuse

---

[9] The referenced instruction read as follows:

> [n]othing said or done by the attorneys who have tried this case is to be considered by you as evidence of any fact. The opening statements that you heard last week, and the final arguments that you're going to hear here in a few moments, are intended to help you in understanding the evidence and applying the law to the evidence but they are not themselves evidence. And accordingly, if any arguments, statements or remark of any of the lawyers is not based upon the evidence or the law as stated in my instructions, then you should disregard that statement, argument or remark.

17

or provocation. Therefore, trial counsel was not ineffective in failing to object to a correct jury instruction, and it would have been futile to include this issue on appeal.

Turning to our analysis of the instruction, we note that, pursuant to this Court's precedent,

[j]ury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as it accurately reflects the law. Deference is given to the circuit court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed for an abuse of discretion.

Syl. pt. 15, *State v. Bradshaw*, 193 W. Va. 519, 524, 457 S.E.2d 456, 461 (1995). *See also* Syl. pt. 4, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995) ("A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the

18

instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.").

The unconstitutionality of shifting the burden of proof to a defendant as to an element of a crime has long been recognized:

> In *Sandstrom*[ *v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)], the United States Supreme Court held that . . . burden-shifting *by presumption* violates the Due Process Clause of the United States Constitution. 442 U.S. at 520-21, 99 S. Ct. at 2457, 61 L. Ed. 2d at 48-49. It is unconstitutional to shift the burden of proving an element of a crime to the defendant. It lifts from the State the burden it must bear and then it puts the burden upon the accused, who constitutionally should not suffer under it. "[T]he Fourteenth Amendment's guarantees prohibit a State from shifting to the defendant the burden of disproving an element of the crime charged." *Sandstrom*, 442 U.S. at 527, 99 S. Ct. at 2461, 61 L. Ed. 2d at 53. (Rehnquist, J., concurring).

*State v. Miller*, 197 W. Va. 588, 608, 476 S.E.2d 535, 555 (1996) (emphasis added).

Notably however, the instruction at issue in the case *sub judice* merely *allowed* the jury to make an inference, it did not *direct the jury to make a presumption*. The difference between an inference and a presumption was discussed in *State v. Greenlief*, 168 W. Va. 567, 285 S.E.2d 395 (1981), wherein the Court explained that,

> the United States Supreme Court struck down a state conviction which had utilized an instruction [providing "[t]he law *presumes* that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 513, 99 S. Ct. at 2453, 61 L. Ed. 2d 39 (emphasis added).] In discussing the problem with the use of the word "presume" in jury instructions, the Supreme Court said "[the jurors] were not told

19

that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory." *Id*. at 515, 99 S. Ct. at 2454[, 61 L. Ed. 2d 39.] In the instant action, however, the jury was told that there was "a permissible inference of fact" which was not mandatory or binding at all.

Further, and perhaps the most compelling, support for this resolution is found in the dictionary definition of these terms. "Presume" is defined as "to suppose to be true without proof." Webster's New Collegiate Dictionary 904 (1981). "Inference", on the other hand, is defined as "the act of passing from one proposition, statement, or judgment considered as true to another whose truth is believed to follow from that of the former." *Id*. at 585. The distinction between the two terms is apparent, and the permissible inference instruction does not serve to shift any of the burden of proof to the defendant.

*Greenlief*, 168 W. Va. at 567, 285 S.E.2d at 395. The instruction of which Mr. Coleman complains uses the discretionary term "may," and gives the jury a permissive choice as to whether to apply the inference. Because the instruction allows a permissible inference, and does not impose a mandatory presumption upon the jury, it does not shift the burden of proof to the defendant. *See id*. (observing that a "permissible inference instruction does not serve to shift any of the burden of proof to the defendant."); Syl. pt. 2, *State v. Browning*, 199 W. Va. 417, 485 S.E.2d 1 (1997) ("In a murder case, an instruction that a jury may infer malice and the intent to kill where the State proves beyond a reasonable doubt that the defendant, without lawful justification, excuse or provocation, shot the victim with a firearm, does not unconstitutionally shift the burden of proof.").

20

Moreover, this Court has expressly held that malice, intent, premeditation, and deliberation may be inferred from the use of a deadly weapon under the proper circumstances:

> "'In a homicide trial, malice and intent may be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which the jury does not believe afforded the defendant excuse, justification or provocation for his conduct. Whether premeditation and deliberation may likewise be inferred, depends upon the circumstances of the case.' Point 2, Syllabus, *State v. Bowles*, 117 W. Va. 217[, 185 S.E. 205 (1936)]." *Syllabus, State v. Johnson*, 142 W. Va. 284, 95 S.E.2d 409 (1956).

Syl. pt. 5, *State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994). We have emphasized, however, that such an instruction is not proper where evidence has been presented that indicates the defendant had a legal excuse for his or her actions:

> It is erroneous in a first degree murder case to instruct the jury that if the defendant killed the deceased with the use of a deadly weapon, then intent, malice, willfulness, deliberation, and premeditation may be inferred from that fact, *where there is evidence that the defendant's actions were based on some legal excuse, justification, or provocation.* To the extent that the instruction in *State v. Louk*, 171 W. Va. 639, 643, 301 S.E.2d 596, 600 (1983), is contrary to these principles, it is disapproved.

Syl. pt. 6, *Jenkins*, 191 W. Va. 87, 443 S.E.2d 244. As noted in Syllabus point 6 of *Jenkins*, the Court disapproved an instruction that the Court in *State v. Louk* had found to be

21

permissible.[10]  The *Jenkins* Court rejected the *Louk* instruction because it failed to include qualifying language that informed the jury that it may apply the inference only "if the evidence does not show that the defendant had an excuse, justification, or provocation." *Jenkins*, 191 W. Va. at 94, 443 S.E.2d at 251.  The *Jenkins* Court explained that "[i]t is any of these elements [(excuse, justification, or provocation)] that, if believed by the jury, will reduce the homicide to something less than murder."  *Id.*  We find the instruction given at Mr. Coleman's trial is similar to the instruction that was expressly approved in the case of *State v. Miller*, 197 W. Va. at 606, 476 S.E.2d at 553:

> "The Court instructs the jury that in a prosecution for murder, if the State proves beyond a reasonable doubt that the defendant, without lawful justification, excuse or provocation, fired a deadly weapon in the direction where a person was located then from such circumstances it may be inferred that the defendant acted with malice and the intent to kill."

---

[10] The instruction given in *State v. Louk*, 171 W. Va. 639, 643, 301 S.E.2d 596, 600 (1983), which was rejected by this Court in *State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244, stated:

> "The Court instructs the jury that to convict one of murder, it is not necessary that malice should exist in the heart of the Defendant against the deceased.  If the jury believe from the evidence that the Defendant was guilty of shooting with a deadly weapon, the deceased, and of killing him, the intent, the malice and the willfulness, deliberation and premeditation may be inferred from the act, and such malice may not be directed against any particular person, but such as shown a heart regardless of social duty and fatally bent on mischief."

*Louk*, 171 W. Va. at 643, 301 S.E.2d at 600.

22

*Id.* at 606, 476 S.E.2d at 553. Like the *Miller* instruction, the instruction at issue in the instant case properly instructed the jury that the inference was permissible "under circumstances where the defendant does not have excuse, justification, or provocation for his conduct."

The instant case also is comparable to *Miller* insofar as the defense theories asserted by Mr. Coleman are similar to those asserted by the defendant in *Miller*. In this regard, the *Miller* Court explained that whether such defenses are credible is for the jury to determine:

> [t]he defendant's theory of the case was that the killing was either accidental, *i.e.*, "I did not know the gun was loaded," or incapacity due to intoxication, *i.e.*, "I do not recall what happened because of the drugs and alcohol," or self-defense. We agree with the defendant that these defenses are incompatible with malice. For example, a "malicious accident" is an oxymoron. However, it was up to the jury to determine whether any of these defenses were credible. We do not believe that merely telling a jury it may infer malice "if the State proves beyond a reasonable doubt that the defendant, without lawful justification, excuse or provocation fired a deadly weapon" is error of a constitutional dimension.

197 W. Va. at 609, 476 S.E.2d at 556.

Mr. Coleman further complains that the permissible inference instruction given to the jury improperly allowed it to infer deliberation and premeditation when other West Virginia cases merely approved inferences related to intent and malice. As noted

23

above, in Syllabus point 5 of *Jenkins*, 191 W. Va. 87, 443 S.E.2d 244, this Court held, in relevant part, that "[w]hether premeditation and deliberation may . . . be inferred[] depends upon the circumstances of the case." (Quotations and citations omitted). Thus, when the circumstance are proper, an instruction allowing the jury to infer premeditation and deliberation likewise is proper. Based upon this holding, in order to establish that the giving of such an instruction was objectionable, it was incumbent upon Mr. Coleman to demonstrate that the instruction was not supported by the evidence presented. He has failed to make such an argument to this Court.

With respect to the permissible inference instruction itself, Mr. Coleman lastly complains that the instruction did not explicitly provide that the State was required to prove the absence of excuse, justification, or provocation beyond a reasonable doubt.[11] He notes that such a requirement was included in instructions that were approved by this Court in *Miller*, 197 W. Va. 588, 476 S.E.2d 535,[12] and in *State v. Browning*, 199 W. Va.

---

[11] Mr. Coleman's trial counsel also argued to the jury that "[y]ou got an impaired guy committing a dumb, grossly negligent act. And it is a case of intent. Specific intent. That has to be demonstration to you beyond a reasonable doubt." Mr. Colman complains that his counsel's comment was ineffective insofar as it failed to specifically state that the burden was upon the state to establish intent. However, as discussed below, the instructions presented to the jury properly set out the State's burden of proof.

[12] The instruction given in *Miller* provided,

> [t]he Court instructs the jury that in a prosecution for murder, *if the State proves beyond a reasonable doubt* that the

24

at 418, 485 S.E.2d at 2.[13]  Although the permissible inference instruction given in the instant case, standing alone, did not expressly address the State's burden of proof, the jury was, however, instructed that, "[t]he burden is always upon the prosecution to prove guilt beyond a reasonable doubt, and this burden never shifts to the defendant in a criminal case, nor does the defendant ever have the burden or duty of calling witnesses or producing any evidence."  The jury was further instructed, with respect to the excuse or justification that was raised by Mr. Coleman as a defense, i.e., voluntary intoxication, that,

> [a]lthough voluntary intoxication will never provide a legal excuse for the commission of a crime, the fact that a person may have been grossly intoxicated at the time of the commission of a crime may negate the existence of the specific intent of premeditation and deliberation, which is an element of the offense of murder in the first degree.  So, the evidence that a defendant acted while in a state of gross intoxication is to be considered in determining whether or not the defendant acted with the specific intent of premeditation and deliberation.

> defendant, without lawful justification, excuse or provocation, fired a deadly weapon in the direction where a person was located then from such circumstances it may be inferred that the defendant acted with malice and the intent to kill."

*Id.* at 606, 476 S.E.2d at 553 (emphasis added).

[13] In Syl. pt. 2 of *State v. Browning*, 199 W. Va. 417, 418, 485 S.E.2d 1, 2 (1997), the Court held: "[i]n a murder case, an instruction that a jury may infer malice and the intent to kill *where the State proves beyond a reasonable doubt* that the defendant, without lawful justification, excuse or provocation, shot the victim with a firearm, does not unconstitutionally shift the burden of proof."  (Emphasis added).

25

> If the evidence in the case leaves you with a reasonable doubt that the accused was capable of forming the specific intent to commit the crime charged because of gross intoxication, then you should acquit the defendant of the offense of Murder of the First Degree and deliberate on the lesser included offenses of Murder of the Second Degree, Voluntary Manslaughter, and Involuntary Manslaughter.

Because the permissible inference instruction did not shift the burden of proof, and because the instructions, as a whole, correctly reflected the law as it pertains to permissible inferences, the circuit court correctly rejected the claim of ineffective assistance of counsel based upon trial counsel's failure to object to the same. Likewise, because the instructions were correct, appellate counsel was not ineffective in failing to raise this issue on appeal.

Finally, Mr. Coleman complains that the above quoted comments made by the State during its closing improperly shifted the burden of proof. In addressing this issue, the trial court found the prosecutor's statements regarding the inference that may be drawn from the use of a firearm were not improper:

> 62. [sic]     Trial counsel was not ineffective for failing to object to the prosecutor's argument regarding this jury instruction and malice. Petitioner's expert witness testified that it would have been improper for the assistant prosecutor to reread the instruction to the jury. In reviewing her argument as a whole, and placing the argument regarding the deadly weapon inference into context, it is clear that the prosecuting attorney was not urging the jury to ignore the court's instruction. Her argument was correct:  the jury may

26

infer certain of the mental elements of first degree murder from the use of a deadly weapon. However, her argument went on to press the point that the petitioner did not have excuse, justification, or provocation for his crime and further went on to stress that other evidence demonstrated that the petitioner acted with malice, deliberation, premeditation and intention. Additionally, the court notes that the jury was repeatedly instructed that what the lawyers said was not evidence.

We have reviewed the complained of closing remarks by the State and we agree with the circuit court's conclusion that there was no error. The first portion of the statement was simple hyperbole. The second portion, while incomplete, was not a misstatement of the law and did not shift the burden of proof to Mr. Coleman. Furthermore, as we already have observed, the jury was advised that comments by the attorneys were not evidence, and the jury was properly instructed as to the permissible inference at issue. Thus, trial counsel was not ineffective by failing to object to the comments, and appellate counsel was not ineffective in failing to appeal on this ground.

### C. State v. Jackson Requirements

Pursuant to *State v. Jackson*, 171 W. Va. 329, 298 S.E.2d 866 (1982),

Protection of a defendant's constitutional privilege against self-incrimination and right to assistance of counsel at pre-trial court-ordered psychiatric examinations, requires that a tape-recording of the entire interview be given to his and the government's lawyer, and an in camera suppression hearing be held to guarantee that the court-ordered psychiatrist's testimony will not contain any incriminating statements.

27

A defendant cannot waive his state and federal constitutional privileges against self-incrimination and rights to assistance of counsel at court-ordered pre-trial psychiatric examinations except upon advice of counsel.

Syl. pts. 2 & 3, *id.*

Prior to trial, Mr. Coleman was examined by the State's psychiatric expert Dr. Ralph Smith. The examination was audio recorded and Dr. Smith prepared a written report of the examination. Dr. Smith testified to the contents of his report and the full unredacted report was admitted into evidence. It appears that the report was not published to the jury. Mr. Coleman's trial counsel objected to the admission of the report based upon hearsay, but did not object to Mr. Coleman's statements contained therein or refer to *Jackson*. The court denied counsel's request for a limiting instruction based upon hearsay evidence.

In the habeas hearing before the circuit court, trial counsel explained that he did not object to Mr. Coleman's statements contained in the report because he believed them to be beneficial to Mr. Coleman's case. In fact, it appears that Dr. Smith's report was similar to Mr. Coleman's own expert's report, with only the conclusions being drawn therefrom being substantially different.

Mr. Coleman argues to this Court that his trial counsel was ineffective by failing to invoke the protections established in *Jackson*. According to Mr. Coleman, the report contained

> unredacted statements made by Mr. Coleman during the evaluation interview. . . . The report stated that Mr. Coleman admitted that he and his wife "had a fight" and that she got a restraining order placed on him. The report further stated that [Mr. Coleman] would stay "up all night with his rifle pointed at his father's house so they wouldn't kill him." The report also contained a statement from Mr. Coleman about the shooting. "He picked up the rifle. He pulled the hammer back on the rifle and his finger slipped and the gun went off. He said, 'I looked up and that was it. She was laid back on the couch and it tore the side of her face off.'" The report further included the statement, "I didn't know the gun was loaded, guess I didn't get the bullets all out when I unloaded it." . . . The report also contained a statement that Mr. Coleman "feels that he deserves to be punished for wrongs he has committed." The report further contained a six page summary of the State's case against Mr. Coleman, including information that the trial court had previously ruled was inadmissible pursuant to Rule 404(b). The report was replete with these prejudicial statements and admissions made by Mr. Coleman during the course of his interview with the State's expert.

The State responds that trial counsel was not ineffective insofar as he provided strategic grounds for not pursuing *Jackson* protections. The State notes that Mr. Cagle made a strategic decision to not object to any statements contained in Dr. Smith's report based upon his conclusion that the statements bolstered Mr. Coleman's defense. The State contends that such a strategic decision is reasonable and does not establish ineffective assistance of counsel.

29

The circuit court found no error, reasoning that

> 51. Trial counsel made an objectively reasonable, strategic decision not to object to the petitioner's statements to Ralph Smith. As petitioner would not testify, the more times the consistent story that the petitioner had not meant to shoot his wife, but mistakenly or accidentally shot her in an effort to confront her and make her admit the conspiracy that he and only he could hear on the tapes[14] was heard by the jury, and the more often the jury heard his ostensibly sincere words of remorse the more benefit accrued to the petitioner. It was not an unreasonable strategic decision to permit the statement of the petitioner to Dr. Smith into evidence. Moreover, as the statement was entirely consistent with what petitioner said to others, including his own evaluator, the admission of those statements did not affect the rest of the proceeding. Petitioner satisfies neither prong of the *Strickland/Miller* analysis.

We agree with the circuit court's reasoning. Moreover, most of the complained of comments were admitted through other testimony and evidence, thus Mr. Coleman is unable to establish that the outcome of his trial would have been different had trial counsel requested the protections of *Jackson*. *See* Syl. pt. 5, in part, *Miller*, 194 W. Va. 3, 459 S.E.2d 114 (requiring "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."). Finally, trial counsel explained during the habeas proceeding that his decision to not object to the evidence was tactical, and calculated to have favorable details, that aligned with evidence

---

[14] There were numerous audio tapes admitted into evidence. Mr. Coleman had alleged to several individuals that the tapes contained threats by Mrs. Coleman to harm Mr. Coleman and/or members of his family. No one who listened to the tapes heard any threats on them.

30

provided by Mr. Coleman's own psychiatric expert repeated to the jury. "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. pt. 21, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974). Accordingly, we find trial counsel was not ineffective in failing to invoke the protections established in *Jackson.* Likewise appellant counsel was not ineffective in failing to raise this issue on appeal.[15]

### *D. Absence of Elected or Acting Prosecuting Attorney*

During the course of Mr. Coleman's trial, the Kanawha County Prosecuting Attorney abruptly resigned. As a result, the following relevant exchange occurred outside of the presence of the jury:

> **THE COURT**: . . . [T]he Prosecutor, came in the office this morning, announced that he was resigning, and he left. . . .
>
> So right now that office does not have a Prosecuting Attorney effectively. Legally there is no boss, no prosecutor. . . . You all function through your boss, okay? It

---

[15] Mr. Coleman also complains, in passing, that Dr. Smith's report contained 404(b) evidence that the court had ruled was inadmissible. Mr. Coleman does not identify the specific 404(b) evidence of which he complains, or explain precisely how he was prejudiced by its admission. Accordingly, this evidence will not be addressed.

31

runs him down, not you all up.  You all can't sign indictments. . . .

. . . .

My thought was, well, possibly there could be some basis for an objection to continuation of this case by you, because she has no – Her [assistant prosecuting attorney Reagan Whitmyer's] authority to act as a prosecutor in this county is now nonexistent.

**MR. CAGLE:** Oh, I ain't going to do that.

**THE COURT:** Well, I didn't think you were.

**MR. CAGLE:** I wouldn't do that.

**THE COURT:** I'm just looking after the record.

**MR. CAGLE:** I understand.

**THE COURT:** You have any thoughts on it, Reagan?

**MS. WHITMYER:** No, I would have to look at the Code and see if we can still – I'm still an assistant, sworn, whether I can still carry on my functions.  And I assume – well, I don't know.  I would have to look at it, research it, and see if there is any precedent for it.  But if they're willing to waive any objections that they have –

**MR. CAGLE:** I don't know what objection I would have.

The Court then instructed Mr. Cagle to speak with Mr. Coleman and Mr. Cagle asked permission to discuss it with Mr. Coleman over the lunch hour. The trial court granted permission. Later in the day, the following exchange took place:

> **THE COURT:** Before I bring the jury out, Mr. Cagle, have you had a chance to discuss with Mr. Coleman the resignation of Mr. Charnock and the legal impact it may have on Mr. Holstein [Daniel Holstein, an assistant prosecuting attorney] and Ms. Whitmyer continuing with this case?
>
> . . . .
>
> **MR. CAGLE:** The answer is: I really haven't discussed it any further, I will tell you, because I don't think it has any implication, and I'm not going to make any motion unless [Mr. Coleman] tells me to do that. And I think he will listen to me on that.
>
> And I will tell you right here on the record, it ain't got nothing to do with me, with this trial, Mr. Coleman, or any of that. I think that's just political flap that I have no interest in, and it has no implication about this trial.
>
> **THE COURT:** Sounds like a pretty good waiver to me.
>
> **MR. CAGLE:** I intend for it. I'm not going to make that motion unless he just starts screaming at me to do it.
>
> **THE COURT:** What do you think, Mr. Coleman?
>
> **THE DEFENDANT:** I agree with Jim.

33

The prosecutor resigned on a Friday. A new prosecuting attorney was sworn into office the following Wednesday.

In its habeas ruling, the circuit court concluded:

22.    The court finds that there was not error of constitutional dimension in continuing the trial after the elected prosecutor resigned. The court further finds that trial counsel was not ineffective in failing to move for a continuance or mistrial after the prosecutor resigned. Appellate counsel was not ineffective for failing to raise the resignation as an issue on appeal.

23.    The petitioner has failed to establish that there is, in fact, a constitutional right for a petitioner to be tried only when there is an elected or appointed prosecutor. While the office of prosecuting attorney is defined and circumscribed by statute, petitioner has provided no law, either from the State of West Virginia, or any other jurisdiction, pronouncing that a trial must cease when there is a mid-trial resignation (or death) of the prosecuting attorney.

24.    In the case at bar, there was a prosecuting attorney in and for Kanawha County when the petitioner was indicted, when the trial commenced, and when the jury verdict was returned.

25.    Moreover, defense counsel explained that strategically he was of the opinion that the trial was proceeding well. He was optimistic for a favorable verdict, and his client had been in jail for a year when the trial commenced.

26.    When asked about possible harm or benefit from moving for a mistrial—and having one granted—petitioner's expert offered only vague speculation that having heard the state's case the defense might have an advantage at retrial, or the change in prosecutor might have resulted in a plea offer.

34

27. There is no evidence that the absence of an elected prosecutor, or delaying the trial by continuance or mistrial—affected the result of these proceedings.

28. As a stand-alone issue, the petitioner has failed in his burden of proof to demonstrate that continuing the trial during the two (at most) days between the resignation of one prosecutor and the appointment of another constituted a violation of any Constitutional right.

29. As a sub-ground for the issue of ineffective assistance of trial counsel, petitioner has failed to satisfy the *Strickland/Miller* standard. It was a reasoned, strategic decision not to move for a mistrial or continuance. There is no indication the court would have granted such motion, if made. Although petitioner assails counsel for failing to research the issue before he waived it, the petitioner in the nine years since that mid-trial resignation has proffered no law in support of his position that the trial should have been interrupted by the resignation. Trial counsel was optimistic of a favorable verdict and his client had spent a year in jail. Without engaging in hindsight, and looking at the facts as they were at the time, counsel's strategic decision was reasonable. Therefore, trial counsel's performance was not objectively deficient. Moreover, there is nothing to suggest that a motion would have been granted. Finally, had trial counsel moved for either a continuance or mistrial, and had such motion been granted, there is nothing to suggest that petitioner would have received a more favorable outcome in a later trial. The evidence against the petitioner was substantial and overwhelming, and was not going to change.

Mr. Coleman cites constitutional and statutory provisions establishing the status of an elected county prosecuting attorney as a constitutional officer and setting out the duties of the office. He then argues to this Court that the circuit court committed structural constitutional error by allowing his trial to proceed when there was no Kanawha

35

County elected or acting prosecuting attorney in office during the final five days of his nine day trial. Mr. Coleman contends that the West Virginia Code allows for a duly elected prosecuting attorney to hire assistant prosecuting attorneys and that assistant prosecuting attorneys are not "public officers," and any duties they perform remain subject to the ultimate authority of the prosecutor. *See* Syl. pt. 3, *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 490 S.E.2d 642 (1997) ("'The prosecuting attorney is a constitutional officer who exercises the sovereign power of the State at the will of the people and he is at all times answerable to them. W. Va. Const., art. 2, Sec. 2; art. 3, Sec. 2; art. 9, Sec. 1.' Syl. Pt. 2, *State ex rel. Preissler v. Dostert*, 163 W. Va. 719, 260 S.E.2d 279 (1979)."); *State v. Macri*, 199 W. Va. 696, 704, 487 S.E.2d 891, 899 (1996) ("Although an assistant prosecuting attorney 'may perform the same duties as his [or her] principal,' any authority under this statute allowing an assistant to perform these duties remains subject to the ultimate authority and control of the prosecutor."), *modified on other grounds by State v. Zain*, 207 W. Va. 54, 528 S.E.2d 748 (1999).[16] Mr. Coleman argues that, because there was no elected prosecuting attorney in Kanawha County during the final portion of his trial, his case could not constitutionally go forward, and a mistrial should have been declared or a continuance granted. He claims that his trial counsel's failure to move for a

---

[16] Mr. Coleman notes that there is now a statute allowing for the appointment of a temporary successor to fill the position for thirty days while a replacement is chosen by the county commission. *See* W. Va. Code § 3-10-8 (LexisNexis 2018). There was no such statute in effect at the time of Mr. Coleman's trial.

36

mistrial or adequately consult with him on this issue amounts to ineffective assistance. Mr. Coleman contends that his counsel did not know the law regarding the effect of the absence of an elected prosecuting attorney and did not seek to research the issue when given an opportunity to do so.

The State responds that the trial court did not commit structural constitutional error by allowing Mr. Coleman's trial to proceed in the absence of an elected or acting prosecuting attorney, and trial counsel was not ineffective in failing to request a mistrial or failing to consult with Mr. Coleman on this issue. The State notes that Mr. Coleman has failed to provide any authority at any stage of this case over the last nine years that would support his contention that a mid-trial resignation of an elected prosecutor should have interrupted his trial.

As the circuit court and the State have pointed out, Mr. Colman has failed to provide any authority holding that a criminal trial in progress must not proceed further upon the resignation of a county prosecuting attorney.[17] Furthermore, at the habeas hearing, trial counsel explained that his decision was tactical in that Mr. Coleman had already spent a year in jail and counsel was optimistic about the verdict. Nevertheless, this

---

[17] The elected prosecutor was not personally prosecuting Mr. Coleman's case; therefore, his absence did not directly impact the proceedings.

37

issue is resolved by Mr. Coleman's affirmation, on the record, of his trial counsel's decision to not object to the trial going forward in the absence of an elected or appointed prosecuting attorney currently holding office. As quoted above, the record demonstrates that the issue was discussed in Mr. Coleman's presence, and the circuit court asked Mr. Coleman for his opinion on the matter. Mr. Coleman stated that he agreed with his trial counsel. Assuming *arguendo* that trial counsel's decision to proceed was erroneous, Mr. Colman's ratification of that decision on the record prevents him from now raising it as a ground for claiming ineffective assistance of counsel.

> A party simply cannot acquiesce to, or be the source of, an error during proceedings before a tribunal and then complain of that error at a later date. *See, e.g., State v. Crabtree*, 198 W. Va. 620, 627, 482 S.E.2d 605, 612 (1996) ("Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences."); *Smith v. Bechtold*, 190 W. Va. 315, 319, 438 S.E.2d 347, 351 (1993) ("[I]t is not appropriate for an appellate body to grant relief to a party who invites error in a lower tribunal." (Citations omitted).).

*Hanlon v. Logan Cty. Bd. of Educ.*, 201 W. Va. 305, 316, 496 S.E.2d 447, 458 (1997).

Accordingly, we find the circuit court did not err in concluding Mr. Coleman's trial counsel was not ineffective, and therefore denying his habeas petition, based upon on this ground.[18]

---

[18] Mr. Coleman did not argue to this Court that his appellate counsel was ineffective in failing to raise this particular issue on appeal.

### *E. 404(b) Evidence*

Mr. Coleman next argues that counsel was ineffective in failing to request an

omnibus pre-trial hearing, pursuant to *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516

(1994), to review 404(b) evidence the State intended to admit. The State responds that the

procedure utilized by the trial court satisfied the requirements for admitting 404(b)

evidence. We agree.

Prior to voir dire, the State advised the trial court that it had given notice of

404(b) evidence. No 404(b) conference was requested by trial counsel; however, the trial

court subsequently instructed the State on how it should proceed with respect to the

voluminous 404(b) evidence:

> [L]et's do this. You may not even call some of these
> witnesses. . . . [A]s you're calling these potential might-be
> 404(b) witnesses, watch it, and when you're going to get into
> – if you expect to get into a piece of might-be-404(b) material,
> would you please interrupt the examination of that witness and
> approach the bench, and I will make a determination then, right
> then and there as the witness is testifying, as to whether its
> admitted.

The trial proceeded in this manner. In denying Mr. Coleman's habeas petition in relation

to this ground, the circuit court stated:

> Before any witness testified as to prior difficulties or
> collateral bad acts, a hearing was held out of the presence of
> the jury. The court determined that the state sought to
> introduce the evidence to show that the shooting was not an
> accident, or mistaken, and that the petitioner had motive to kill

his wife. A limiting instruction was given at the time the witness testified and in the final charge. The court determined that the petitioner committed the act, and that the act was more probative than prejudicial. There was no error in the admission of 404(b) evidence from the witnesses.

We find no grounds for reversing the circuit court's denial of Mr. Coleman's petition for a writ of habeas corpus in connection with this issue. With respect to conducting an *in camera* hearing to consider the admissibility of 404(b) evidence, this Court in *McGinnis* held that,

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. *Before admitting the evidence*, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Syl. pt. 2, *McGinnis*, 193 W. Va. 147, 455 S.E.2d 516.  This holding merely required the

circuit court to conduct an in camera hearing "[b]efore admitting the evidence." *Id.*

*McGinnis* additionally references *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986),

*overruled on other grounds by State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d

123 (1990), in which this court held that

> Before a trial court can determine that evidence of
> collateral crimes is admissible under one of the exceptions, an
> in camera hearing is necessary to allow a trial court to carefully
> consider the admissibility of collateral crime evidence and to
> properly balance the probative value of such evidence against
> its prejudicial effect.

Syl. pt. 3, *Dolin*, 176 W. Va. 688, 347 S.E.2d 208.[19]  Although the 404(b) hearing that was

held in *McGinnis* happened to be held pre-trial, there is nothing in the holdings of either

*McGinnis* or *Dolin* that requires such a hearing to always be held prior to trial.  Because of

the voluminous amount of purported 404(b) evidence at issue, and the number of witnesses

from whom bits of such evidence might be presented, the circuit court utilized a method of

holding a separate *in camera* hearing prior to the admission of each portion of 404(b)

evidence.[20]  Mr. Coleman has not shown how he was prejudiced by this approach used by

the trial court.  Accordingly, we find trial counsel was not ineffective in failing to request

---

[19] The trial in *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986), preceded the adoption of Rule 404(b) in West Virginia.

[20] Rule 404(b) was amended in 2014.  Under the current version of the rule, reasonable notice of crimes, wrongs, or other acts may be provided "during trial if the court, for good cause, excuses lack of pretrial notice."  Rule 404(b)(2)(A) & (B).

a pre-trial 404(b) hearing. Likewise, because we find no error, appellate counsel was not ineffective in failing to raise this issue on appeal. Thus, the circuit court did not err in denying Mr. Coleman's habeas petition based on this issue.

### F. Failure to Investigate Evidence

Mr. Coleman contends that his trial counsel was ineffective in failing to reasonably investigate and uncover evidence contained in the State's discovery. He identifies the evidence, which he characterizes as exculpatory evidence,[21] as the soot and stippling on the victim's finger. Mr. Coleman suggests that, if his counsel had hired an expert to review the State's photographs, or provided the photographs to his firearm expert, the soot and stippling on the victim's finger would have been apparent. Mr. Coleman avers that, if his trial counsel had conducted a reasonable investigation and discovered the soot, he would have been able to formulate a more complete theory of the defense based upon this evidence. Moreover, he contends that, if the defense firearm expert, Mr. Roane, had known of the soot and stippling, he could have incorporated into the tests he performed, and the video he prepared, a scenario where the victim's hand made contact with the barrel of the rifle.

---

[21] Counsel for Mr. Coleman refers to the evidence as exculpatory. To the extent that exculpatory evidence is generally used in the context of evidence to which the State has a burden of disclosing, that term is not being used in the present context.

42

The State responds by noting that, during the habeas hearing, defense trial counsel testified that he had sufficient time to make effective use of the soot and stippling evidence when the same was discovered during trial. There were five days between the discovery of the soot in the photograph and Mr. Roane's testimony. At the habeas hearing, trial counsel explained that he had time, including an entire weekend, to discuss the evidence with Mr. Roane. Mr. Roane then addressed the soot in his testimony and opined that its presence was consistent with a scenario where Mrs. Coleman pushed or swatted the muzzle of the rifle causing it to discharge.

The circuit court found the following:

84. As to the issue of the medical examiner's belated discovery of a typographical error in his report saying there was no soot or stippling, when in fact there was, the court notes that trial counsel had five days between the testimony and the testimony of his expert. Trial counsel effectively cross-examined the medical examiner about his mistake. Trial counsel testified at the omnibus evidentiary hearing that he had ample time to consult with his expert, and that the expert had ample time to consider that information. In fact, trial counsel testified that his expert's theory had been that something came into contact with the gun-such as the victim's hand-and that the gun discharged. The belated revelation confirmed that theory.

85. The only harm proffered by habeas counsel is that the expert didn't redo his video. However, trial counsel explained that the video couldn't be redone to conform with the medical examiner's testimony, because, essentially, no one was going to swat the gun away with live ammunition, it was simply too dangerous.

43

86. The court finds that petitioner's trial counsel made a strategic decision not to seek a continuance or a mistrial. Counsel believed the case was going as well as could be expected, his client was in jail, and Counsel had five days (including two full weekend days) to consult with and prepare his expert. He testified at the omnibus hearing that he did not need more time to address that issue. Therefore, the court finds it was not objectively deficient performance to fail to ask for a continuance or mistrial. Moreover, the court finds there is nothing to indicate that a continuance or mistrial would have been granted, as the remedy would have been to give counsel time to prepare: which counsel had. The petitioner fails to satisfy the *Strickland*/*Miller* Standard for ineffective assistance of counsel.

We find the circuit court's reasoning is sound. Moreover, it is worth noting that, while Mr. Coleman complains that Mr. Roane did not prepare a video demonstration of a scenario with a victim batting the rifle muzzle, he does not direct the Court's attention to any portion of the record wherein the expert stated that no such video was prepared due to time constraints, or that any reason at all was given for the absence of such a video demonstration. During the habeas proceeding, trial counsel testified that he had sufficient time to discuss this evidence with Mr. Roane, and the evidence actually provided additional support for the theory of how the gun discharged that Mr. Roane had already developed. In light of these facts, we find trial counsel's performance was not "deficient under an objective standard of reasonableness." Syl. pt. 5, in part, *State v. Miller*, 194 W. Va. 3, 459

S.E.2d 114. Thus, the circuit court did not err in denying Mr. Colman's habeas petition in relation to this ground.[22]

### G. Toxicology Testing and Results

Mr. Coleman next contends that his trial counsel was ineffective in failing to object, on Confrontation Clause grounds, to the results of a toxicology report being admitted by someone other than the technician who performed the analysis. *See* Syl. pt. 6, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006) ("Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness."). Specifically, Mr. Coleman complains about testimony by the State's medical examiner, Dr. Boiko, regarding toxicology testing and results of the victim's blood, when Dr. Boiko did not perform the toxicology testing. Mr. Coleman asserts that, because Dr.

---

[22] In connection with this issue, Mr. Coleman makes no challenge regarding appellate counsel.

45

Boiko did not perform the toxicology testing, his counsel was unable to effectively cross examine the expert.[23]

---

[23]At trial, the State inquired of the State's medical examiner, Dr. Boiko, in relevant part as follows:

> Q.    Did your office personnel perform tests to determine whether there were any controlled substances in Mrs. Coleman's system at the time that she was shot?
>
> A.    Yes. We performed toxicological study. It was negative. It means no alcohol, no drugs in the body.
>
> Q.    Okay. No alcohol, no marijuana, no methamphetamine?
>
> A.    No.
>
> Q.    Nothing like that. No controlled substances of any kind?
>
> A.    No.

On cross-examination, trial counsel queried:

> Q.    Did you do the toxicology?
>
> A.    No.
>
> Q.    That's not something you as the pathologist would do, is it?
>
> A.    No. But I received the report from toxicology lab.
>
> Q.    So that the jury distinguishes that, the toxicology is done by others?

The State responds by arguing that the medical examiners testimony regarding the toxicology report was neither exculpatory nor incriminatory and, even if the Confrontation Clause was violated, such error was harmless beyond a reasonable doubt.

The circuit court's order denying Mr. Coleman's petition for a writ of habeas corpus addresses this issue as follows:

> 87. As to the issue of Dr. Boiko and his testimony regarding the toxicology reports from the victim's blood, this Court does not find that trial counsel was ineffective for failing to object to such testimony. Moreover, the Court does not believe such testimony was a *Crawford* violation.
>
> 88. Dr. Boiko's testimony was not an unqualified success for the state with his revelation about his mistake as to stippling. Moreover, as to the toxicology reports and the absence of any methamphetamine (or other substance) in the blood, Dr. Boiko could not pinpoint precisely whether the tests were on transfused blood or admission blood, and admitted that the results could differ between the two sources. Therefore, the suggestion was before the jury that perhaps the victim had used some substance but it was not revealed because the testing was done on transfused blood.[24] It is noteworthy that [this] is the only suggestion that the victim may have used a substance on the evening of her death. The victim was at work, went to McDonald's, stopped by another store and went home where she was shot in less than a half hour after her stop at McDonald's. . . . No one testified that she was impaired, and

---

A.     That's correct.
[24] However, it should be noted that, during his testimony, Dr. Boiko ultimately found a notation on the report expressly stating that the blood tested was "admission blood," *i.e.*, blood that was extracted upon the victim's admission and prior to any transfusions.

the petitioner did not state to the police, his father, his neighbor, the 911 operator, or either psychiatrist that the victim had ingested drugs or that the victim had grabbed or swatted the gun. The testimony about the blood was neither exculpatory of nor incriminatory of the petitioner. It was not objectionable, and even if it were, the testimony was harmless beyond all doubt. . . .[25] In this case, Boiko's testimony about the victim's blood did not inculpate the petitioner and did not result in a violation of any constitutional right.

89. It is rampant speculation to believe that calling a toxicologist would have revealed anything other than the fact the victim did not have any substances in her blood. And the testimony about the blood results did not violate any of the petitioner's constifutiona1 rights.

(Footnotes added).

Assuming, for the sake of argument, that trial counsel should have objected on Confrontation Clause grounds to Dr. Boiko's testimony regarding the results of a toxicology analysis that he did not, himself, perform, we find any resulting error arising therefrom to be harmless beyond a reasonable doubt.

---

[25] The circuit court's order contained the following quotation from *State v Flack*, 232 W. Va. 708, 715-16, 753 S.E. 2d 761, 768-69 (2013):

Of critical import is that nothing in Dr. Kaplan's testimony implicated the defendant in the homicide, linked him to the crimes charged, or made it more likely or less likely that the defendant committed the murder of Matthew Flack. . . . Accordingly, we find the error raised to be harmless beyond a reasonable doubt.

(Citations omitted).

This Court has recognized that "[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction." Syl. pt. 20, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974). Furthermore, "In a criminal case, the burden is upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Syl. pt. 3 *State v. Frazier*, 229 W. Va. 724, 735 S.E.2d 727 (2012).

We find any error that may have resulted from trial counsel's failure to object to Dr. Boiko's testimony regarding the toxicology report is harmless beyond a reasonable doubt because the issue of whether or not Mrs. Coleman, the victim of the crime, had controlled substances in her system was not relevant under the facts of this case. *See, e.g.*, *People v. Rutterschmidt*, 55 Cal. 4th 650, 661, 147 Cal. Rptr. 3d 518, 526, 286 P.3d 435, 441-42 (2012) (holding that any Confrontation Clause violation in admitting toxicology analysis of victim's blood constituted harmless error); *Commonwealth v. Montrond*, 477 Mass. 127, 138, 75 N.E.3d 9, ___ (2017) ("Assuming without deciding that it was error to admit the testimony [pertaining to the toxicology report], we agree that any such error was harmless beyond a reasonable doubt."); *State v. Ortega*, 327 P.3d 1076, 1084-85 (N.M. 2014) ("[W]e hold that it was harmless error to admit the testimonial statements included in the toxicology report.").

Furthermore, while Mr. Coleman asserts to this Court that the toxicology of the victim was a critical issue and would have supported the accident theory of the defense, he provides no specific explanation of how the evidence supported his theory that the shooting was an accident or, in the alternative, that Mrs. Coleman batted at the rifle causing it to discharge. Furthermore, as the State has pointed out, there was no other evidence presented at trial that would have substantiated that the victim was using controlled substances or alcohol on the night she was killed. Finally, we note that the evidence presented in this case overwhelmingly supported the jury's verdict of guilt. Therefore we find no error in the circuit court's denial of Mr. Coleman's petition for habeas corpus as to this ground.[26]

### H. References to Mr. Coleman's Pretrial Incarceration

Mr. Coleman next argues that his counsel was ineffective in failing to object to testimony and evidence referring to Mr. Coleman's pre-trial incarceration. In support of his argument, Mr. Coleman complains of two specific portions of the testimony. First, Dr. Thomas Martin, the defense psychiatrist, stated, during his direct examination by trial counsel, that he "got involved with Mr. Coleman's case through a consult through a local

---

[26] Mr. Coleman has not asserted that his appellate counsel was ineffective in failing to raise this particular issue on appeal.

50

physician . . . who had assessed him, I believe in the jail once he had been arrested, last March 2006." Next, the lead investigating officer, Detective Snuffer, who was called by the State, testified during his direct examination regarding how he obtained Mr. Coleman's handwriting samples. He testified that he "met with Mr. Cagle and Mr. Coleman and his investigator at the jail," and "[w]hile we were at the jail, I dictated three letters to Mr. Coleman, and Mr. Coleman - - each word that I dictated, he wrote onto a piece of paper." Mr. Coleman additionally complains that the report of the State's psychiatric expert contained references to Mr. Coleman being "shackled" during an interview. Mr. Coleman contends that his counsel's failure to object meets the *Strickland/Miller* test for ineffective assistance because his counsel has given no strategic reason for not objecting and because the jury could have inferred that the court had found his theory of an accidental shooting unpersuasive or that the court believed he was too dangerous to release. Mr. Coleman relies on *United States v. Fakih*, 424 F. App'x 202 (4th Cir. 2011), and asserts that the Fourth Circuit has found remarks about a defendant's pre-trial custody to be clearly improper; however, *Fakih* stands for a slightly different proposition. The Fourth Circuit in *Fakih* commented that it had "previously held that *a prosecutor's questions* about a defendant's pre-trial custody are "clearly improper[.]" *Id.,* 424 F. App'x at 205. In this case, there is no allegation that the prosecutor asked questions about Mr. Coleman's pre-trial custody. Rather, the information was spontaneously disclosed by witnesses during their answers to proper questions, or was contained in a report.

In response to Mr. Coleman's argument, the State merely quotes the circuit court's order and asserts that the order should be affirmed. The circuit court concluded:

> 65. This court disagrees with the petitioner's claim that such references to pre-trial incarceration were "numerous." There were a mere handful of such references (fewer than five, as the court counts) in the record of a trial which spans nearly one thousand pages. Moreover, although the court does not approve of any reference to such pre-trial incarceration, the court must note that those references do not unambiguously refer to the petitioner being in jail, but rather refer to meetings with petitioner and his lawyer "at" the jail, or taking handwriting exemplars "at" the jail. The court believes that it is likely the jury believed that at least at the time of any specific event the petitioner was incarcerated. However, this court does not find that those references to the petitioner's pre-trial incarceration rise to the level of a constitutional violation, reversible error, or ineffective assistance of counsel.

> 66. The references were not numerous. The court believes that it would come as no surprise to jurors that an individual who shot his wife in the face would be arrested and jailed. The court further finds that the evidence in this case against petitioner, while hotly disputed as to the mental elements, was ample and the references to pre-trial incarceration did not affect the verdict. That is, the jury would have convicted the petitioner of murder in the first degree even absent such references.

> 67. While perhaps it was objectively deficient performance for counsel to fail to object to such references at trial, the court finds that petitioner fails to satisfy the "but for" prong of the *Strickland/Miller* analysis. As noted above, merely identifying a mistake by counsel does not equate to ineffective assistance. The mistake must have affected substantial rights of the petitioner. Had petitioner's counsel objected to those references and the jury heard no reference to pre-trial incarceration, the petitioner would still have been convicted of murder in the first degree. Therefore, petitioner

52

fails in his burden and this contention affords the petitioner no relief in habeas corpus.

The circuit court found that trial counsel's failure to object was harmless beyond reasonable doubt. We agree. As demonstrated in the statement of facts above, *see supra* Section I, there was significant evidence of Mr. Coleman's guilt. This evidence established that Mr. Coleman did not dispute that he shot and killed his wife. Rather he claimed that the shooting was an accident. However, the State presented ample evidence to show that the shooting was not accidental, including evidence that Mr. Coleman was knowledgeable about firearms, that Mr. and Mrs. Coleman's relationship had been violent at times, and that Mr. Coleman was angry with Mrs. Coleman and had threatened to kill her. Based upon this evidence, we find no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. pt. 5, in part, *Miller*, 194 W. Va. 3, 459 S.E.2d 114. Accordingly, we find the circuit court did not err in refusing to grant Mr. Coleman's petition for a writ of habeas corpus based upon this issue.

**IV**

**CONCLUSION**

After reviewing each of the issues raised by Mr. Coleman, we have found no grounds upon which to find his trial counsel was ineffective. Thus, we similarly find no

53

error in the May 26, 2017 order of the Circuit Court of Kanawha County denying Mr. Coleman's petition seeking a writ of habeas corpus.  Accordingly, we affirm that order.

Affirmed.